NANCYE VAN STEEMBURG *et al.*, Plaintiffs-Appellants, v. GENERAL AVIATION, INC., *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—0082

Opinion filed February 19, 1993.

Stotis & Baird, of Chicago (Michael S. Baird, of counsel), for appellants.

Larry S. Kaplan, John B. Austin, and Richard F. Baylaender, all of Adler, Kaplan & Begy, of Chicago, for appellee General Aviation, Inc.

Francis D. Morrissey, Richard H. Donohue, Michael A. Pollard, Thomas W. Cushing, and Maureen P. Fitzgerald, all of Baker & McKenzie, of Chicago, and Stephen R. Steigich III and Joseph H. Hamill, both of Condon & Forsyth, of New York, New York, for appellees T.K. Aviation, Inc., and Robertson Transformer Corporation of Indiana, Inc.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

This action arises from the crash of a single-engine Cessna 182-RG aircraft which occurred on October 20, 1982. Plaintiff Gay Olk's decedent, Merl Olk, was piloting the aircraft and was killed in the crash. Plaintiff Nancye Van Steemburg was a passenger in the aircraft and was severely injured in the crash. The aircraft was owned by defendant Robertson Transformer Corporation of Indiana, Inc. (RTCI), and operated by defendant T.K. Aviation, Inc. (T.K.), which runs an aircraft rental facility at Chicago's Midway Airport. T.K. contracted with defendant General Aviation Corporation (GAC), a licensed repair facility, to perform required maintenance to the aircraft.

At trial, plaintiffs argued that GAC negligently maintained the aircraft, and that T.K. and RTCI knew, or with a reasonable degree of care should have known, that the aircraft had been negligently maintained. Plaintiffs asserted that the accident was caused by an engine malfunction brought about by eroded spark plugs which GAC failed to replace at the last annual inspection performed prior to the crash. Defendants, on the other hand, contended that the accident did not result from an engine malfunction but rather from pilot error, in that the decedent continued to fly into known icing conditions against the aircraft manufacturer's express warnings. At the close of plaintiffs' case in chief, the trial court directed a verdict in favor of defendants T.K. and RTCI. Plaintiffs' case against the one remaining defendant, GAC, was submitted to the jury, which returned a verdict in favor of GAC and against plaintiffs.

On appeal, plaintiffs contend that the trial court erred by (1) allowing reference to United States National Transportation Safety Board (NTSB) "opinions" during the cross-examination of plaintiffs' experts; (2) refusing to allow Van Steemburg to explain her lack of

concern about getting into the subject aircraft after T.K.'s counsel raised the issue; (3) refusing to give the jury Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (hereinafter IPI Civil 2d) and precluding comment on GAC's failure to call two of its experts; (4) directing a verdict for T.K. and RTCI when plaintiffs had offered evidence of notice; (5) allowing in-flight test evidence without requiring a showing of substantial similarity; (6) excluding evidence of a prior crash allegedly caused by worn spark plugs; (7) allowing undue emphasis on Kim Canchola's prior statements during cross-examination; (8) allowing into evidence the hearsay statement of an air traffic controller that there was "heavy ice all over the area" in which decedent was flying prior to the crash; and (9) refusing plaintiffs' IPI Civil 2d No. 60.01 jury instruction on the duty to follow the maintenance manual. Additionally, plaintiffs contend that GAC's counsel unfairly prejudiced the jury by offering no evidence to support his comment in opening statement that the engine had been kept in a "junkyard."

Because damages are not at issue on appeal, we have excluded any reference to them in our recitation of the facts. Accordingly, the relevant facts are as follows. RTCI and T.K. maintained a lessor-lessee relationship with respect to the subject aircraft. RTCI owned the aircraft and leased it to T.K. Pursuant to the lease agreement, T.K. assumed primary responsibility for all necessary maintenance of the aircraft at RTCI's expense. Under the applicable Federal aviation regulations, T.K. and RTCI were jointly responsible for maintaining the aircraft in an airworthy condition.

T.K. contracted with GAC to perform all the required maintenance to the aircraft. GAC's normal business operations include both annual and 100-hour maintenance inspections of small aircraft pursuant to guidelines established by the Federal Aviation Administration (FAA). GAC's mechanics are licensed and certified by the FAA to perform both types of aircraft maintenance inspections. The subject aircraft received its last annual inspection prior to the crash on July 27, 1982. GAC mechanic Matt Poelman performed the inspection and maintenance and signed the certificate of airworthiness. As part of the engine maintenance inspection, Poelman cleaned, gapped, and tested all of the spark plugs. (The gap represents the distance between the plug's outer electrode to the massive center electrode.) Poelman gapped the plugs to the manufacturer's recommended gap of 0.016 inches and made the appropriate logbook entries in accordance with Federal aviation regulations. Between July 27 and October 20, the date of the crash, the aircraft was flown approximately 67 hours.

The subject aircraft was a 1979 Cessna 182-RG equipped with a 235-horsepower engine. The engine contained six cylinders and operated with 12 spark plugs. The aircraft was neither equipped nor certified by the FAA for air travel in icing conditions.

The decedent was employed by Hallmark Jewelry, a manufacturer and distributor of jewelry located in Chicago. On the day of the accident, T.K. rented the aircraft to the decedent, who was scheduled to fly it from Chicago to Bentonville, Arkansas, on company business. Also on board the aircraft as passengers were the decedent's fellow employees, Van Steemburg and Kim Canchola.

Prior to takeoff, the decedent conducted a preflight inspection of the aircraft, including a "magneto drop check." At trial, Henry Lederer, plaintiffs' piloting expert, explained that the magneto is the component in an aircraft engine which provides the electricity ultimately going to the spark plugs. The subject aircraft was equipped with two magnetos, each supplying electricity to six spark plugs. According to Lederer, the magneto drop check which the decedent performed registered as normal.

At 5 a.m., the decedent obtained a complete weather briefing from Thomas Keating, a designated weatherman from the National Weather Service. This was the only complete weather briefing the decedent obtained prior to takeoff. The weather at ground level was cold, drizzly, and windy, and the ground temperature was approximately 41 degrees Fahrenheit.

During the briefing, the decedent was advised of occasional moderate icing and low level turbulence. He was also advised that the forecasted freezing altitude was 10,000 feet. Lederer explained the significance of this forecast in the context of ice accumulation on an aircraft. He stated that when there is moisture in the air at a point where the temperature is below freezing, that moisture can accumulate on the aircraft's surface. When the moisture freezes, depending on the location and amount of accumulation, the ice can affect the ability of the aircraft to maintain level flight. Structural icing, or icing which forms on the outside of an aircraft, is not expected at air temperatures that are above the freezing level. Any flight at an altitude below the freezing level would be in air that was not cold enough to allow for the accumulation of ice. The aircraft was scheduled to fly at 6,000 feet, which was 4,000 feet below the forecasted freezing level.

The aircraft departed from Midway Airport at 6:42 a.m. and leveled off at an altitude of between 3,600 and 4,000 feet. Based on his review of various flight records, Lederer stated that it took the decedent only three minutes to climb to 3,600 feet, indicating that the air-

craft was performing properly. During the first 12 to 14 minutes following the 6:42 a.m. takeoff, the decedent and air traffic control (ATC) did not communicate. Lederer was critical of the lack of communication between the decedent and ATC, placing 70% of the blame for this on ATC and 30% on the decedent. During this period, the aircraft was flying substantially slower than normal. The aircraft was also making a number of inadvertent turns, losing altitude, and repeatedly climbing up and down.

Canchola testified that sometime after the aircraft left the ground and leveled off, she noticed ice forming on a part of the plane located below her window. She described the ice as a thin, wafer-like substance. She never saw ice hanging off the wings or on the windshield. Canchola told the decedent that she saw ice, and he told her that he was already aware of it. He immediately radioed to ATC and informed it he was having trouble maintaining altitude because of ice. He then requested permission to fly to a higher altitude. At this point, the decedent was calm. Canchola then noticed the plane start to shift and bounce. The plane failed to gain altitude, and at this point, the decedent started to get upset. According to Canchola, the decedent stated, "That damn" something—"I told them to fix it." She testified that the decedent never indicated to what or whom he was referring, and Canchola had no idea what the decedent had meant by that statement. The decedent informed ATC over the radio that he could not maintain altitude and requested permission to decrease altitude. The decedent was informed by ATC that there was "heavy ice all over the area," and he was instructed to turn around and return to Midway. When the decedent realized he could not make it back to Midway, he prepared for an emergency landing. The last thing Canchola remembered was going into some trees.

On cross-examination, Canchola admitted stating in her deposition that the ice at first looked like hail hitting the wings. She also stated in her deposition that the decedent told ATC that he was having trouble maintaining altitude because of ice. The decedent never mentioned any problems with the "engine," nor did he make mention of any "power loss." Canchola herself noticed no problems with the engine. To her recollection, the engine ran continuously throughout the entire flight, and at no time did she hear the engine hesitate, cough, or backfire.

Canchola also noticed that the decedent was having problems controlling the steering yoke and that the plane began to rock. She recalled the decedent saying that he was going to turn the engine

off to avoid a fire upon impact, but she was unable to remember whether he actually turned it off.

On redirect examination, Canchola testified that near the end of her deposition, she was informed that the wings on the plane were above the door to the plane, and thus it would not have been possible for her to see ice forming on the top of the wing from her vantage point. On re-cross-examination, she acknowledged that in her deposition, she agreed that the ice had appeared on the bottom of the wing, which she could see while looking up.

At approximately 7 a.m., the plane crash-landed on a golf course near Lemont, Illinois. Firefighters and rescue personnel arrived approximately one hour later. There was no fire detected at the scene. Further, no ice was noted on or near the aircraft at the time rescue personnel arrived. NTSB and FAA officials arrived at approximately 10 a.m. and began their investigation. An NTSB accident report was subsequently issued.

Plaintiffs called various witnesses to testify about the decedent's careful piloting habits. Gay Olk, the decedent's wife, testified that on the morning of the crash, the decedent telephoned for weather information before leaving home. She also stated that the decedent routinely subscribed to aviation magazines and newsletters. Olk was then questioned about a flight she and the decedent took to California during which she recalled seeing ice forming on the struts of the plane. The decedent confirmed the presence of ice, and then radioed for permission to fly to a higher altitude to get rid of the ice. According to Olk, once the plane reached the higher altitude, the ice melted. On cross-examination, however, she acknowledged that the decedent eventually had to land the aircraft because of ice accumulation. The decedent never complained about mechanical problems with T.K. planes.

In addition, Richard Ciezlak, a former co-worker of the decedent, testified for the plaintiffs that he never considered Olk to be a procrastinator. He flew with the decedent a few weeks before the crash and experienced no trouble during the flight. Al Englehart, a United Airlines pilot and a ground school instructor of 20 years, also testified on the decedent's behalf, stating that the decedent was a cautious pilot who strived to maintain proficiency in piloting.

Plaintiffs also called three experts to testify. Besides Lederer, their piloting expert, plaintiffs called Edward Rachanski and Weldon Garrelts, both of whom offered opinions that severely eroded spark plugs contributed to the crash.

Lederer was a part-time flight instructor and retired engineer for an aircraft manufacturing company. He stated that it is mandatory for a pilot prior to take off to file a flight path and verify weather conditions. Weather information can be obtained from the National Weather Service and from a service called "PIREPS," wherein pilots, while in flight, report weather conditions back to the ground. He reviewed the available records, including one from the National Weather Service, concerning the weather conditions that existed prior to the crash. Based on his review of these records, Lederer found that the forecasted freezing level of 10,000 feet was made in error. The freezing level was in fact at the approximate altitude that the subject aircraft was assigned to fly.

In Lederer's opinion, the aircraft may have experienced a slight trace of ice build-up, although there was no way to determine exactly how much ice was on the plane. He concluded that based on the characteristics of the subject aircraft and of the type and amount of ice present—light "rime"—the aircraft would have been able to land safely had the engine been running properly.

Lederer further stated that the aircraft manual recommends that the pilot change altitudes when he experiences icing on the aircraft's frame. He confirmed that the decedent had requested to increase his altitude due to ice. However, Lederer concluded that the decedent was mistaken when he told ATC that his problems resulted from ice. Instead, he attributed the aircraft's problems to a malfunction in the engine, particularly since no ice was found on the plane 45 minutes after the accident. In his opinion, the decedent did everything correctly in preparing for the emergency landing, and he concluded that the decedent had full control of the aircraft throughout the 180-degree turn back to Midway.

On cross-examination, Lederer stated that he was not a licensed mechanic and not licensed to inspect aircraft, nor was he trained in the field of accident reconstruction. He stated that he relied on the NTSB accident report only for information about the weather conditions on the day of the crash. Further, Lederer acknowledged that the weather briefing the decedent had obtained the morning of the crash advised him of occasional moderate icing in the clouds over the entire route. He also acknowledged that the decedent could have determined the inaccuracy of the 10,000 feet forecasted freezing altitude by applying the adiabatic lapse rate to the known ground temperature. Adiabatic lapse rate calculations allow pilots to determine temperature at various altitudes, premised upon a 3.5 degree Fahrenheit decrease in temperature for every 1,000-foot in-

crease in altitude. At 4,000 feet—the approximate altitude at which the decedent was flying—given a ground temperature of 41 degrees, the decedent could have estimated the temperature to be 27 degrees, five degrees below freezing.

Lederer described how ice formation upon an airframe can inhibit its ability to fly. Specifically, this structural icing reduces both an aircraft's wing lift and air speed because of increased weight and drag, adversely affecting a pilot's ability to control the aircraft.

Edward Rachanski testified as an engine and aviation expert, discussing tests run on the 7 of the 12 aircraft spark plugs remaining. Five of the plugs were either improperly removed by NTSB investigators or damaged in the crash. He also offered his theory of the cause of the crash, namely, that the spark plugs were severely eroded and prevented the engine from producing sufficient power to maintain flight. In his view, the spark plugs were already excessively worn when GAC performed its annual inspection in July of 1982.

Rachanski examined photographs of the engine and engine exhaust ports that were taken in 1985, and noted that there was evidence of black soot on four of the ports. He attributed the buildup to improper spark plug misfires occurring over the course of 100 to 200 hours of operation. The effect of the buildup was to prevent the engine from gaining full power. In comparing the spark plugs to a Champion Spark Plug visual chart, Rachanski opined that all of the spark plugs were "worn out severe" and should have been changed 100 to 200 hours before the crash.

Plaintiffs attempted to elicit testimony from Rachanski about a prior accident of a 152 Cessna which occurred in August 1981. Rachanski concluded that worn spark plugs caused that accident, and as in this case, GAC was derelict in failing to replace them sooner. The trial judge, however, refused to allow in evidence of the prior crash on the ground that it was not substantially similar to the incident at issue.

Rachanski was shown a series of cylinder port photographs that were taken shortly after the accident. He conceded that they showed no evidence of carbon residue or "fouling" and appeared entirely different from the photographs Rachanski had relied on in forming his opinion as to the cause of the crash. The earlier photographs were taken before any contaminants had been able to accumulate from the series of engine run-ups which were later performed. Rachanski had not seen the earlier photographs prior to trial.

Rachanski was familiar with two engine run-ups that had been performed in February 1983 and March 1984. He was also familiar with a 1985 flight test conducted by defendants, the results of which were admitted into evidence over plaintiffs' objection. Using the seven remaining spark plugs from the subject aircraft along with five new plugs, the engine satisfactorily performed during both run-ups. During the 1985 flight test the remaining seven spark plugs were placed in another Cessna 182-RG aircraft. Six of the plugs were installed so that they alone were powered by one of the two magnetos in the aircraft engine. At one point in the test the aircraft was able to fly using voltage solely from the right magneto containing six of the original plugs.

Rachanski was also questioned about T.K.'s involvement, and he testified that T.K. fully complied with the applicable Federal aviation regulations requiring annual inspections and appropriate logbook entries certifying the airworthiness of the aircraft. In Rachanski's view, GAC was a qualified licensed repair facility which had made the appropriate entries in the aircraft and engine logbooks after the July 27, 1982, annual inspection. T.K. was entitled to rely upon GAC's expert workmanship and its certification of the aircraft as "airworthy." Rachanski could not state whether T.K. had been notified of an engine problem between July 1982 and the date of the accident. He agreed that there was no duty imposed on T.K. or RTCI to perform any additional maintenance or inspections beyond those set forth in the Federal aviation regulations absent knowledge of any problems with the aircraft occurring after the July 27 inspection.

Plaintiffs also called Weldon Garrelts, an associate professor of aviation at the University of Illinois whose primary area of expertise is the investigation of failures of aircraft to produce full or partial power during flight. His visual inspection of the spark plugs in December 1982 established that the plugs were excessively worn and eroded to their copper center cores. The electrodes were egg shaped, and based on their shape, he ascertained that the plugs should have been replaced by GAC when it performed its annual inspection in July of 1982. He stated that the plugs were operated a "good 200 hours beyond what [he] would consider their normal operational life." In his view, the erosion of the spark plugs caused a partial power loss which contributed to the accident. He examined the cockpit controls and, based on the power settings and the configuration of the propeller after impact, concluded that the decedent was trying to get full power out of the engine at the time of im-

pact, but was unable to do so. Garrelts stated that if the GAC mechanic who had performed the annual inspection would have visually inspected the plugs in accordance with Champion recommendations, "he would have thrown them all in the barrel and put in new ones."

On cross-examination, Garrelts conceded that the spark plugs functioned properly at both engine run-ups, which he attended. He stated that the principal factor to be considered when servicing a spark plug is the amount of electrode wear. If the spark plug is proper in all other respects, Garrelts stated that he would reinstall it in the aircraft despite the number of hours of use.

Van Steemburg testified that she flew as a front seat passenger in the aircraft piloted by the decedent on October 13, 1982. Another passenger was Monroe Allison, a co-worker of Van Steemburg and the decedent. Van Steemburg stated that during the flight the engine began to make a coughing or choking noise and then dropped "like an elevator" before it eventually climbed back above the clouds. The decedent radioed to someone, but she could not recall what was said. According to Van Steemburg, she became less concerned about the incident after she noticed that Allison was reading a newspaper and did not seem bothered by what had occurred.

Prior to taking off on October 20, Van Steemburg recalled the decedent performing an in-depth check of the aircraft which lasted between 30 and 45 minutes. She had limited memory of what occurred from that point on. The first full day she recalled was December 2 in the hospital.

On cross-examination, Van Steemburg acknowledged that during the October 13 trip, the decedent complained that the automatic pilot would not stay locked on the course setting and that the landing lights did not work when they attempted to land at Midway. When questioned as to whether she was concerned about getting back into the aircraft given what had occurred on October 13, she replied, "No, I didn't." The trial judge would not permit plaintiffs' counsel to elicit from Van Steemburg the reason she was not concerned, namely, that the decedent had told her that he would inform T.K. to fix whatever problem had occurred with the aircraft on October 13. The trial judge viewed Van Steemburg's explanation as an attempt by plaintiffs to prove T.K. had notice, and he specifically disallowed it because there was no actual proof of such notice and he was concerned that the jury would engage in speculation and conjecture on this issue.

The trial judge directed a verdict in favor of T.K. and RTCI at the conclusion of plaintiffs' case in chief, finding insufficient evidence of either actual or constructive notice on their part.

Allison testified for GAC. He stated that the October 13 flight was "trouble-free" and that the plane experienced no sudden loss in altitude. He also flew with the decedent in the spring of 1981 and stated that the aircraft they flew, which was not the subject aircraft, experienced numerous mechanical problems. Specifically, at 9,000 feet the aircraft was turning wildly and bouncing around because of a failure of the autopilot until it finally leveled off at 4,000 feet. The decedent landed the aircraft in Bloomington, Illinois, but, although no repairs were made on the aircraft, he later decided to fly it back to Chicago. On cross-examination, Allison testified that the decedent was a competent, professional pilot who always recorded problems experienced while in flight.

Richard Sullivan, president of GAC, testified that he received no complaints regarding the maintenance work his company had performed on the subject aircraft. On cross-examination, he agreed that GAC mechanics were supposed to use the Champion color chart in deciding whether spark plugs should be replaced, and that if they did not do so, they would be breaking company rules. Further, he acknowledged that the record of the plane's annual inspection makes no mention of checking the spark plugs. He also stated that a new set of plugs would have cost less than $200.

On redirect examination, Sullivan read from the engine log book which stated that the spark plugs had been cleaned, gapped, and tested on July 27, 1982.

GAC also called Poelman, the mechanic who performed the July 27 inspection. Although he had no recall of the inspection, he did testify as to the standard custom and practice for servicing spark plugs during an annual inspection. He stated that the first step was to make a visual examination with a Champion chart. He would then proceed to clean the plugs and re-gap them, and then put them in a pressure tester. According to Champion, the spark plug manufacturer, the maximum safe-wear gap recommended for Champion spark plugs is 0.041 inches. At the inspection, the spark plugs were each gapped to 0.016 inches.

On cross-examination, Poelman agreed that use of the Champion chart was an essential first step, but that even if the plugs failed the visual comparison test and the chart said to throw the plugs away, he would still use the plugs if they passed the other tests.

James Schoonmaker, Champion Spark Plug employee and GAC expert, testified that he examined the seven undamaged plugs, ran production tests, and found them to be within safe operating limits. Schoonmaker tested the plugs with an erosion tool called the Champion CT482 "go/no-go" gauge, and the plugs were all within safe-wear specifications and acceptable for reinstallation into the aircraft. He also microscopically inspected the plugs and found none to be eroded to their copper center cores. According to Schoonmaker, if the gap is within specifications, a spark plug cannot fail in operation because of electrode erosion.

Schoonmaker acknowledged that he was not a mechanic or aircraft accident investigator. Further, he noted his familiarity with a technical paper written by a Champion engineer and service department head entitled "Aviation Spark Plug Operational Factors," which stated that more voltage is required to fire an old plug than a new plug, even if the gaps are the same. He agreed that the Champion color chart and service manual state that if the spark plugs fail the visual inspection, they should be replaced, and that according to those sources, the accident spark plugs should have been replaced.

Oliver Witte, a private pilot, testified that he flew the subject aircraft on October 5, 1982, and experienced no power loss or other abnormalities. He did not encounter structural or carburetor icing during that flight. Gene Simon, another private pilot, stated that he had rented the subject aircraft on 10 separate occasions in August, September, and October of 1982. During none of the flights did he experience engine trouble.

Further, Eugene Miller, one of GAC's experts, testified that on October 12, 1982, he replaced the propeller on the subject aircraft. As part of his testing, he performed an engine run-up and detected no problems. He also discussed the in-flight test of the seven remaining spark plugs performed on November 6, 1985. While another pilot flew the plane, Miller observed the cockpit instruments and determined that the spark plugs were performing well.

On cross-examination, Miller acknowledged that when the in-flight test was performed, no representative of plaintiffs was present. He also acknowledged that no attempt was made to re-create the weather conditions that existed on the day of the crash.

GAC rested its case without calling Jack Eggspuehler, its piloting expert, or Michael Smith, its weather expert. Consequently, plaintiffs requested that they be allowed to tender IPI Civil 2d No. 5.01 instruction pointing out GAC's failure to produce these wit-

nesses, but the trial court denied their request. Plaintiffs also requested permission to submit an IPI Civil 2d No. 60.01 instruction to the jury regarding the duty to follow the manufacturer's maintenance manual, which was also denied.

In addition, over plaintiffs' objection and contrary to a prior ruling on plaintiffs' motion *in limine*, the trial court permitted defendants to cross-examine plaintiffs' experts with specific references to two "opinions" contained in the NTSB report.

After closing arguments, the case was submitted to the jury, which returned a verdict in favor of GAC. Plaintiffs now appeal from various trial court rulings and evidentiary determinations, as well as from the directed verdict in favor of T.K. and RTCI.

We first consider plaintiffs' argument that the trial court erred by allowing defendants to use findings contained in the NTSB report in their cross-examination of plaintiffs' experts. Specifically, plaintiffs' experts were asked if, in forming their opinions, they were aware that: (1) NTSB investigators found no evidence of pre-impact power loss, and (2) NTSB investigators noted only one emergency condition with respect to the aircraft, namely, airframe icing. Before addressing this issue, we must first determine how the findings at issue are to be characterized. Defendants maintain that they are nothing more than factual evaluations arrived at during the course of an official investigation. Plaintiffs, on the other hand, argue that the findings amount to causal opinions of the NTSB investigator, Fred Rathke, who was unqualified to render them. The trial judge, after reviewing Rathke's evidentiary deposition, agreed with plaintiffs. In fact, he granted plaintiffs' motion *in limine* precluding the use of such NTSB opinions as substantive evidence. Upon careful review of Rathke's deposition, we also agree with plaintiffs.

With this in mind, we turn to plaintiffs' contention that the NTSB opinions were put before the jury in the guise of impeachment in order to circumvent the court's preclusion of them as substantive evidence. GAC argues that plaintiffs' experts "opened the door" to cross-examination regarding the contents of the NTSB report by questioning their experts about other contents of the report which supported their theory that icing did not cause the crash.

In support of its view, GAC points to the direct examination of Lederer, plaintiffs' piloting expert, wherein he was asked to state his opinion as to the amount of ice that he believed was present on the aircraft. Lederer stated, "[B]ased on the NTSB report and the other reports I have read, I would say that it was possibly a trace, maybe it was very light ice." GAC contends that this statement

was tantamount to Lederer telling the jury that the NTSB concluded both that ice was not a factor in the accident and that, in fact, an engine power loss—and not icing—caused the accident. In GAC's view, the trial court properly allowed it to explore other areas of the report which would have tended to contradict Lederer's conclusion.

■ We view defendants' argument that Lederer "opened the door" to proof about the plane not experiencing pre-impact power loss to be tenuous at best. We cannot accept that a reasonable jury would automatically presume that the NTSB found engine failure to be the cause of the crash based on Rathke's statement that there was a trace or light amount of ice.

Moreover, we place great weight on the trial court's initial decision to preclude defendants from using the two opinions at issue as substantive evidence. While the trial judge did not directly state so in the record, we can reasonably infer from his decision that he considered the opinions to be inherently unreliable and therefore unfairly prejudicial to plaintiffs. Our review of Rathke's evidence deposition indicates, in fact, that the opinions were based largely on information derived from secondary sources and not from his own personal knowledge.

Specifically, Rathke based his finding as to lack of pre-impact power loss primarily on the statements of two bystanders who stated they heard the engine running. Plaintiffs never had an opportunity to cross-examine Rathke to apprise the jury of this because Rathke was precluded under Federal law from being called as a witness. Significantly, plaintiffs never contended that the aircraft experienced complete power loss; rather, they maintained that the aircraft only lost partial power during the flight and that this partial power loss was the primary cause of the crash. Merely because two bystanders heard an engine running prior to the crash does not mean that the aircraft was not experiencing a partial power loss. Again, plaintiffs were never able to make this distinction to the jury.

In addition, Rathke's opinion that airframe icing was the only emergency condition detected was based on the radio transmission transcripts he reviewed during his investigation and was not based on anything he personally observed on the aircraft or at the crash site. Although defendants contend that Rathke's opinion in this regard was merely cumulative and therefore harmless because of the abundance of other weather-related evidence, we disagree. Given the governmental nature of Rathke's opinion, there was a high risk

that the jury gave it more weight than it was due, considering the hearsay nature of the information supporting his opinion.

Defendants also argue that plaintiffs' experts read and/or relied on the NTSB report as a basis for their opinions regarding the cause of the crash. Consequently, defendants maintain, they were properly permitted to cross-examine and impeach plaintiffs' experts concerning materials within the report—both factual observations and opinions—reviewed by the experts which did not support their conclusions. While there is no dispute here that an expert's reliance on factual observations noted in the NTSB report is reasonable, defendants have failed to show that an expert's reliance on the opinions of the NTSB investigator is likewise reasonable. Our supreme court has held that an expert may base his opinion on facts, data, or opinions otherwise inadmissible in evidence if they are of a type reasonably relied upon by experts in the field (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322; *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171), and the expert may be required to disclose the underlying facts, data, or opinions on cross-examination. (*Wilson*, 84 Ill. 2d at 194, 417 N.E.2d at 1327.) The requirement of reasonable reliance provides a check on the trustworthiness of the expert's opinion and its foundation. Whether reliance is reasonable depends in part upon whether the facts, data, or opinions are sufficiently trustworthy.

Given the hearsay nature of the information upon which Rathke's opinions were based, we conclude that his opinions were not sufficiently trustworthy to make reliance on them reasonable. Therefore, the disclosure of these opinions to the jury, even on cross-examination, was improper. Plaintiffs do not dispute that Lederer read the NTSB report, but the record indicates that he relied on it in forming his opinion only insofar as the National Weather Service summary which was appended to it. As there was no dispute about the weather forecast, the parties had previously stipulated to its admission. On cross-examination, defendants were free to clear up the fact that Rathke's opinion was based on that portion of the NTSB report only, without bringing to the jury's attention Rathke's hearsay-based opinions.

In sum, we find that the trial court abused its discretion in permitting the opinions at issue to be used allegedly to impeach plaintiffs' experts. Moreover, we reject defendants' contention that any error in the use of Rathke's opinions was harmless. Among other things, plaintiffs never had an opportunity to cross-examine Rathke in the jury's presence to point out his qualifications, or lack thereof,

to issue opinions of the kind at issue, or to elicit facts which would have weakened or qualified his opinions, such as the fact that the opinions, as stated, were derived in large part from the hearsay statements of bystanders and others. Further, contrary to what defendants argue, the jury may well have been unduly influenced by the governmental nature of Rathke's opinions, which entirely supported defendants' theory of the case and which were referred to more than once during the trial. For all of these reasons, we conclude that plaintiffs were substantially prejudiced.

Plaintiffs also maintain that the trial court erred in refusing to allow Van Steemberg to explain her lack of concern about getting into the aircraft. Before trial, defendants filed a motion *in limine* to exclude Van Steemburg's testimony regarding her recollection of the October 13 flight in the subject aircraft which the decedent was piloting. The trial court denied defendants' motion, and Van Steemburg was allowed to testify that the engine began to cough or choke and that she felt a sudden drop in altitude during the flight.

On cross-examination, Van Steemburg admitted that on October 13, the decedent informed her that the automatic pilot on the aircraft would not lock and that the landing lights did not work. Defense counsel then asked, "You didn't have any concern about getting back in that same plane, did you?" Van Steemburg replied, "No, I didn't."

In a sidebar conference prior to redirect examination, plaintiffs' counsel argued that defense counsel had "opened the door" to further inquiry regarding why Van Steemburg had no concern about getting back into the airplane. Plaintiffs' counsel pointed to Van Steemburg's deposition in which she stated that she had no apprehension about getting back into the plane because the decedent had told her that he had called T.K. and told them to fix "the problem."

Van Steemburg's deposition testimony established that the decedent had spoken to her about the malfunctioning landing lights and automatic pilot. When asked, "Did he [the decedent] say anything further about the automatic pilot, other than what you have just told us?" Van Steemburg replied, "The only thing I recall is him mentioning that he was going to call T.K. Aviation in the morning, and something about my reminding him to call them, if he hadn't already done it." On October 14, she spoke with the decedent and asked if he had called "that place about the plane" and he replied, "Yes." She did not ask him about the specific problem about which he had allegedly notified T.K. Nor did she speak with the decedent about any repairs. She stated that she was not concerned about the

matter and when asked why replied, "I don't know. I just assumed that would have been done. It's not a good idea to assume things, but I just assumed it was done. I knew that when we got there, that Merl would go through a checklist of the plane and maybe, I just kind of assumed, whatever check he would go through, would reveal these things. I am sure that he would have checked to see if the same thing was wrong."

Plaintiffs argue that as a result of not being allowed to explain the reason for Van Steemburg's lack of concern in boarding the aircraft on October 20, the jury was left with the false belief that she lacked concern because nothing of any consequence happened on the prior flight. GAC contends that the trial court properly excluded her explanation because it would have included a hearsay statement allegedly made by the decedent.

GAC argues that plaintiffs were merely trying to circumvent the trial court's previous ruling barring such circumstantial evidence of notice on the part of T.K. This is precisely how the trial court viewed plaintiffs' attempts at getting in Van Steemburg's explanation.

■■ We conclude that the trial court erred in barring Van Steemburg's explanation. It is clear to us that plaintiffs were not offering her explanation as evidence of notice to T.K. Rather, it was offered to show Van Steemburg's state of mind. Accordingly, the statement allegedly made by the decedent is nonhearsay. A statement made out of court is not hearsay where it is made by one person and becomes known to another and is offered for the purpose of showing the latter's state of mind as a circumstance under which the latter acted and as bearing upon her conduct. Under such a scenario, the speaking of the words is independently relevant regardless of the truth contained therein and the statements are admissible as nonhearsay. (*People v. Peterson* (1988), 171 Ill. App. 3d 730, 735, 525 N.E.2d 946, 949. See also *Heller v. Jonathan Investments, Inc.* (1985), 135 Ill. App. 3d 350, 358, 481 N.E.2d 997, 1003, *rev'd on other grounds* (1986), 113 Ill. 2d 60, 495 N.E.2d 589.) As plaintiffs emphasize, absent Van Steemburg's explanation as to why she boarded the aircraft with no concern, the jury in all likelihood viewed the remainder of her testimony with suspicion. Under the circumstances, we consider this an unjust result.

To prevent unfair prejudice to defendants, the trial court could have cautioned the jury that Van Steemburg's explanation was only to be considered insofar as it reflected on her state of mind, and

not as proof that the decedent informed T.K. of a problem with the aircraft.

Plaintiffs also assign as error the trial court's refusal to tender to the jury Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971).

IPI Civil 2d No. 5.01 states:

"If a party to this case has failed to produce a witness within his power to produce, you may infer that the testimony of the witness would be adverse to that party if you believe *each* of the following elements:

(1) The witness was under the control of the party and could have been produced by the exercise of reasonable diligence.

(2) The witness was not equally available to an adverse party.

(3) A reasonably prudent person under the same or similar circumstances would have produced the witness if he believed the testimony would be favorable to him.

(4) No reasonable excuse for the failure has been shown."

In this regard, plaintiffs also maintain that the court erred in precluding them from commenting during closing argument on GAC's failure to call its piloting and ice-accumulation experts.

In response, GAC first points out that plaintiffs failed to call three witnesses of their own. GAC also maintains that it chose not to call the two experts because their testimony was not essential to its case and would have offered the jury only cumulative evidence, which plaintiffs' experts had already offered. It is well recognized that the missing witness instruction is not warranted when the testimony of the missing witnesses would have been merely cumulative. (*Hollembaek v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 777, 484 N.E.2d 1237, 1240.) It was on this basis that the trial court refused to give the IPI Civil 2d No. 5.01 instruction.

Initially, we note the explanation given by plaintiffs for failing to call three of their witnesses, and we find it to be persuasive. We must add, however, that even were we not persuaded, the fact that plaintiffs failed to call witnesses would not in itself bar them from arguing about GAC's failure to do so. Our sole concern in addressing this issue is whether GAC has offered a reasonable explanation for failing to call its experts. We find that it has not.

■ In the case of GAC's ice-accumulation expert, Michael Smith, GAC contends that his testimony would have been merely cumulative. Plaintiffs assert, on the other hand, that GAC did not

call Smith because he would have assisted plaintiffs' case, having allegedly stated in his deposition that there was only a light amount of ice present at the time of the crash. His testimony would have corroborated the testimony of plaintiffs' expert, who stated that there was only a trace or light amount of ice on the aircraft. We find plaintiffs' argument to be the more convincing.

With respect to GAC's piloting expert, Jack Eggspuehler, GAC asserts that Eggspuehler would have criticized the deceased for his failure to take evasive action in time to avoid ice accumulation on the aircraft. According to GAC, the need to call Eggspuehler was obviated by the testimony of plaintiffs' expert, Lederer, who criticized the decedent and ATC for not communicating for 13 minutes during flight. GAC considers the testimony of the experts to be comparable and therefore cumulative. We, however, do not. Although Lederer testified that he was critical of the decedent and ATC's lack of communication, he concluded that the communication breakdown had nothing to do with the crash. GAC, on the other hand, concluded that the lack of communication was tantamount to a lack of evasive action which, in turn, was a primary cause of the accident. Because the experts' testimony was not comparable, plaintiffs should have had an opportunity to cross-examine Eggspuehler to bring out any weaknesses in this theory.

Since defendants have offered no reasonable excuse for their failure to call Smith and Eggspuehler, we conclude that IPI Civil 2d No. 5.01 should have been given. Based on the same rationale, the trial court should have permitted plaintiffs to comment in closing argument on GAC's failure to call them. (*Bargman*, 181 Ill. App. 3d at 1028, 537 N.E.2d at 940.) "[A] party's failure to call a witness within its control is a proper subject of comment." *Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 1048, 460 N.E.2d 464, 469.

Since we hold that the matter must be remanded for a new trial, we shall now discuss the propriety of granting a directed verdict in favor of T.K. and RTCI and the remaining assignment of errors offered by plaintiffs.

Plaintiffs contend that the trial court erred in directing a verdict for T.K. and RTCI at the close of plaintiffs' case in chief. The trial court issued this ruling based on its determination that plaintiffs had failed to prove either actual or constructive notice on the part of T.K. and RTCI that the spark plugs were defective.

A jury may not base a verdict on mere guess, speculation or conjecture (*Brown v. Kidd* (1991), 217 Ill. App. 3d 860, 868, 578 N.E.2d 224, 230); directed verdicts prevent such a result. A di-

rected verdict is proper when all of the evidence, viewed in a light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14; *Pearson v. Ford Motor Co.* (1975), 32 Ill. App. 3d 188, 190, 336 N.E.2d 528, 530.) Conflicts in the evidence must be resolved in favor of the party opposing the motion for directed verdict. *Poulakis v. Taylor Rental Center, Inc.* (1991), 209 Ill. App. 3d 378, 381, 568 N.E.2d 196, 198.

In count II of their third amended complaint, plaintiffs alleged that T.K. and RTCI failed to maintain the aircraft in an airworthy condition as required by the applicable Federal aviation regulations, and as a consequence they were injured. In count III of their third amended complaint, plaintiffs alleged that defendants owed them a common law duty of reasonable care beyond that imposed by the Federal aviation regulations, and breached that duty by: (1) failing to effect necessary repairs to the aircraft engine after having been given notice of engine problems on or about October 13, 1982; (2) renting the aircraft with spark plugs that were not airworthy; and (3) taking the aircraft to a facility for maintenance that it knew, or with a reasonable degree of care should have known, did an inadequate job of replacing excessively worn spark plugs.

The applicable Federal aviation regulations place upon the owner or operator of an aircraft the primary responsibility for maintaining the aircraft in an airworthy condition. Defendants do not deny this responsibility. However, Rachanski, plaintiffs' engine expert, did not dispute that defendants complied with the regulations by hiring GAC, a licensed repair facility, to perform an annual inspection on the aircraft in July 1982, and to make the appropriate entries in the logbooks certifying that the plane was airworthy. In his opinion, T.K. and RTCI were entitled to rely on GAC's workmanship and certification of airworthiness.

Further, plaintiffs' second engine expert, Garrelts, testified that T.K. had complied with all mandatory maintenance requirements under the applicable Federal regulations, including having a licensed repair facility perform the annual inspection on the plane.

Nevertheless, plaintiffs contend that they offered sufficient evidence of constructive notice. In this regard, plaintiffs maintain that the evidence established that the spark plugs had been in the aircraft in a defective condition for several months prior to the crash, that employees of T.K. had flown the aircraft during that time period, and that T.K. had a policy of recording any information re-

ceived from renters of the plane regarding problems encountered with the plane.

To prove a case based on constructive notice, a plaintiff must show that a defect or condition existed for a sufficient amount of time so that the defendant should have discovered the defect by the exercise of reasonable care, and it is for the trier of fact to determine if such notice has been established. (*Chapman v. Foggy* (1978), 59 Ill. App. 3d 552, 556, 375 N.E.2d 865, 868.) In this context, a directed verdict is proper only if the evidence will not support a finding that defendant could have discovered the dangerous condition in the exercise of reasonable care. *Chapman*, 59 Ill. App. 3d at 556, 375 N.E.2d at 868.

■■ Applying this standard here, we do not agree with plaintiffs that the evidence supported a finding of constructive notice. As plaintiffs' experts agree, T.K. and RTCI exercised reasonable care by complying with the Federal aviation regulations. They engaged the services of GAC, a qualified, licensed repair facility, to perform an annual inspection. GAC in turn certified the plane as airworthy. As stated, T.K. and RTCI were entitled to rely upon GAC's workmanship and its certification of airworthiness.

■■ Plaintiffs also argue that there was sufficient evidence of actual notice on the part of T.K. and RTCI. Specifically, plaintiffs presented the testimony of Van Steemburg that one week prior to the crash, on October 13, the subject aircraft began to "cough or choke" and lose altitude. Plaintiffs also called various witnesses to testify about the careful piloting habits of the decedent. Plaintiffs maintain that the jury could have reasonably inferred that a pilot with such careful habits would have informed T.K. of the engine problems he had encountered with the aircraft on October 13. Plaintiffs argue that this evidence, in conjunction with Canchola's testimony that one week later, during the October 20 flight, the decedent exclaimed, "I told them to fix it," was sufficient to avoid a directed verdict.

A party is entitled to establish negligence by circumstantial evidence alone. However, such evidence must be reasonable and not merely speculative in nature. (*Laflin v. Estate of Mills* (1977), 53 Ill. App. 3d 29, 32, 368 N.E.2d 522, 525.) "[W]here the evidence presented indicates only a mere possibility that a defendant was negligent, the case must be removed from the jury's consideration." *Shramek v. General Motors Corp.* (1966), 69 Ill. App. 2d 72, 79, 216 N.E.2d 244, 248.

We find that the circumstantial evidence offered by plaintiffs fails to support an inference of probability, rather than possibility, that defendants had actual notice of the alleged defective condition of the spark plugs. (See *Snell v. Village of University Park* (1989), 185 Ill. App. 3d 973, 978, 542 N.E.2d 49, 52.) While some event may have occurred on the October 13 flight to alarm Van Steemburg, an allegation which co-passenger Allison disputes, there is no evidence that it was caused by or was related to the engine or spark plugs. Van Steemburg testified that she only knew that the decedent was having trouble with the autopilot and landing lights. Similarly, as to Canchola's testimony that the decedent said, "I told *them* to fix *it*" (emphasis added), the jury could only be left to speculate as to what or whom the decedent was referring. Notwithstanding that the decedent was a man of careful habits, we cannot say that the evidence was sufficient to avoid a directed verdict, particularly since no other pilot who flew the aircraft between July 27 and October 20, 1982, reported to T.K. that he experienced any problems with it.

Plaintiffs also contend that the trial court erred by allowing into evidence the results of GAC's November 1985 "test flight" without first requiring GAC to show that the flight was substantially similar to the accident flight. Plaintiffs maintain that by permitting GAC to avoid this "substantial similarity" requirement, the trial court essentially allowed the flight into evidence without defendants first establishing a proper foundation.

Generally, the admissibility of experimental evidence depends upon the proponent's ability to show that the essential conditions were the same as those at the time of the accident. (*Tarshes v. Lake Shore Harley Davidson* (1988), 171 Ill. App. 3d 143, 155, 524 N.E.2d 1136, 1143-1144; *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 416, 476 N.E.2d 1232, 1239.) However, "when an experiment is not represented to be a reenactment of the accident and it deals with one aspect or principle directly related to the cause or result of the occurrence, the exact conditions of the accident need not be duplicated." (*Galindo v. Riddell, Inc.* (1982), 107 Ill. App. 3d 139, 144, 437 N.E.2d 376, 381. See also *Barth v. International Harvester Co.* (1987), 160 Ill. App. 3d 1072, 513 N.E.2d 1088.) The trial court's determination of admissibility is within its sound discretion and will not be reversed absent abuse of such discretion. *Ford*, 132 Ill. App. 3d at 416, 476 N.E.2d at 1239.

Defendants contend that the admission of GAC's flight test was necessary to rebut plaintiffs' expert testimony regarding causation.

Plaintiffs conducted two engine ground tests using several of the accident spark plugs. On each occasion, the engine ran and the plugs produced sparks. The plugs also sparked properly while under pressure in plaintiffs' spark plug bench-tester. Though plaintiffs characterize these tests as attempts by them to get the aircraft engine to run, and not as tests to determine the ability of the plugs to spark, nevertheless, the tests did indicate that the plugs could properly spark. At trial, however, plaintiffs asserted that the test results were meaningless because the operational test conditions on the ground were different than those that would be experienced while in flight. Defendants submit that plaintiffs "specifically invited" the jury to reject the validity of the ground tests because the plugs were not subjected to the sort of pressureload created by the rotation of the propeller while in flight. One of plaintiffs' experts stated that such pressure "could break down on the spark plug [and] create a misfire."

■ We agree with the trial court that defendants were entitled to offer evidence of the flight test. We do not view the test flight as one designed to replicate the accident flight, but rather one in a series of tests admitted into evidence to assist the jury in determining the effectiveness of the spark plugs. Further, we are persuaded by GAC's argument that the in-air test of the spark plugs was intended to rebut testimony by plaintiffs' expert that plaintiffs' ground tests were not conclusive because they were not performed under in-flight pressure. The exact conditions of the crash need not have been duplicated, therefore, here, since the test dealt with only one principle relating to the cause of the crash, that being the ability of the spark plugs to function properly under flight pressures. *Galindo*, 107 Ill. App. 3d at 144, 437 N.E.2d at 381.

Plaintiffs were free to cross-examine GAC's witnesses to point out weaknesses in the test results or in the test itself, and to ascertain from them the impact, if any, adverse weather conditions would have had on the test flight. As an aside, while we are critical of the fact that no representative of plaintiffs was present when the test flight was conducted, plaintiffs apparently did not consider this to be so egregious as to warrant raising it as an issue on appeal. Thus, for the foregoing reasons, we find no abuse of discretion in the trial court's decision to admit evidence of the test flight.

Plaintiffs next contend that the trial court erred when it barred them from introducing evidence of another crash that occurred 14 months prior to the subject crash. Plaintiffs sought to introduce this evidence primarily to show that T.K. knew, or with a reason-

able degree of care should have known, of GAC's alleged improper maintenance practices. The plane involved in the prior crash was a Cessna 152 which was operated by T.K. and allegedly maintained by GAC. Plaintiffs made an offer of proof through *voir dire* testimony of their engine expert, Rachanski, that the earlier plane crash was caused when "high time" plugs—spark plugs that logged a high number of flight hours—were left in the plane following its last inspection by GAC mechanics. Plaintiffs argue that admission of this evidence would have prevented the court's later ruling granting a directed verdict in favor of T.K. and RTCI because it would have established that the two companies had notice of GAC's prior failure to replace worn spark plugs.

The general rule regarding the admissibility of prior accidents was summarized by the court in *Ray v. Cock Robin, Inc.* (1973), 10 Ill. App. 3d 276, 282, 293 N.E.2d 483, 487, *aff'd* (1974), 57 Ill. 2d 19, 310 N.E.2d 9:

> "The law is well settled that evidence of prior accidents, occurring at the same place or with the same instrumentality, is competent, not for the purpose of showing independent acts of negligence, but for the limited purposes of showing that the common cause of such accidents was the unsafe condition or thing, and that frequency of such accidents tends to show knowledge of such condition."

The foundation which must be laid to introduce evidence of prior accidents and the details of those accidents depends upon the purpose for which the evidence is being offered. If evidence is being offered to show the existence of a particular danger or hazard, or to show that the defendant had notice of that danger or hazard, then the plaintiff must establish the similarity between the two accidents. (*Henderson v. Illinois Central Gulf R.R. Co.* (1983), 114 Ill. App. 3d 754, 758-59, 449 N.E.2d 942, 945; *Johnson v. Amerco, Inc.* (1980), 87 Ill. App. 3d 827, 846, 409 N.E.2d 299, 314.) It need not be shown that the accidents occurred in an identical manner. Substantial similarity is all that is required. *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 441, 396 N.E.2d 534, 538.

Plaintiffs cite *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 499 N.E.2d 1373, in support of their contention that the two crashes were substantially similar. There, the plaintiff introduced several charts listing accidents involving the same type of catamaran. In all incidents, the catamaran's mast came into contact with a powerline and caused electrocution. The court found that the chart was properly admitted as it tended to show that the defend-

ants had notice that mast-powerline contacts by that type of catamaran resulted in electrocutions. (*Ballweg*, 114 Ill. 2d at 114-15, 499 N.E.2d at 1376.) Our supreme court held that admission of this evidence was proper since the prior accidents were substantially similar to the accident in question. *Ballweg*, 114 Ill. 2d at 114, 499 N.E.2d at 1376.

Plaintiffs maintain that the similarities between the prior plane crash and the crash at issue were substantial. With respect to the aircrafts, plaintiffs point out that both were single-engine Cessnas with the same combustion criteria; both were operated by T.K. and maintained by GAC; and both had been inspected by GAC within approximately 60 hours of operation (although GAC disputes that it performed the last inspection on the Cessna 152). Furthermore, neither pilot experienced preflight test trouble, both pilots took off from Midway and experienced engine problems shortly after takeoff, and both made forced landings. Finally, in plaintiffs' view, both post-accident inspections detected only one mechanical problem, namely, excessively worn spark plugs, and in both cases there was expert testimony that the excessively worn spark plugs contributed to cause the engine problem.

██ There were, however, vast differences between the two crashes, making the trial court's exclusion of the prior crash proper. The critical difference in our view revolves around the issue of spark plug fouling. Specifically, post-crash examinations of the aircrafts revealed that the spark plugs found in the Cessna 152 were extremely fouled. On the other hand, the plugs found in the Cessna 182-RG showed no signs of fouling. Rachanski, plaintiffs' piloting expert, acknowledged that there is a difference between plugs which are fouled and plugs which are eroded, the latter being the alleged cause of the subject crash. Contrary to plaintiffs' assertion that the crash of the Cessna 152 was caused by eroded spark plugs, Rachanski indicated in his deposition that the degree of lead fouling of the Cessna 152 spark plugs is what caused the engine to quit.

In fact, the record reveals that the type of spark plugs found in the Cessna 152 aircraft was so susceptible to fouling during ground and flight operations that Cessna Aircraft Company issued a service letter to its customers recommending the installation of a new spark plug specifically designed to resist such lead fouling in that type of aircraft. Rachanski acknowledged in his deposition that "[i]t *** was common knowledge that you had to watch the bottom spark plugs in that type of engine [Cessna 152]. *** [T]hey had a

tendency to foul—the bottom spark plugs—which caused problems for the engine."

Known as a "trainer" aircraft, the Cessna 152 is generally used for short trips and for training pilots, while the 182-RG is designed for longer trips. Consequently, the Cessna 152 spends a greater amount of time on the ground with its engine running, idling at low power. According to Rachanski, this general use of the Cessna 152 is what accounts for its susceptibility to fouling. In GAC's view, this fouling can cause an accumulation of dirt and contaminants on even properly maintained spark plugs, which in turn can lead to misfires. Rachanski admitted that dirty or fouled plugs of the sort that were found in the Cessna 152 could lead to sudden and complete engine stoppage without prior warning.

Other differences between the Cessna 152 and 182-RG aircrafts are worth noting. Rachanski stated that a Cessna 152 has a four-cylinder engine containing eight spark plugs, while the Cessna 182-RG has a larger and more powerful six-cylinder engine containing 12 spark plugs. In a four-cylinder engine, there is a greater time lag between power impulses so that the failure of a cylinder in a Cessna 152 caused by fouling or any other defect can be much more severe than in a Cessna-182 RG engine. In addition, there is no dispute that the Cessna 152 engine stopped abruptly just after takeoff and could not be restarted. By contrast, the subject Cessna 182-RG aircraft never lost full power. Significantly, post-accident tests of the Cessna 152 engine did not establish the precise cause of the crash because of substantial impact damage to the engine which prevented investigators from conducting a thorough and complete investigation.

As to the weather conditions which existed during the respective crashes, T.K. and RTCI point out that the weather on the day of the prior crash, which occurred on August 18, 1981, was clear and sunny with a ground temperature of 70 degrees Fahrenheit. By contrast, on the day of the crash at issue, the weather was cold, rainy, and windy, and the ground temperature was approximately 41 degrees Fahrenheit. Thus, icing conditions and precipitation were not factors in the 1981 incident, but were in the incident in question.

It is well recognized that "[t]o make the proof of other independent accidents competent, the condition or thing shown to be the common cause of danger in such accidents must be the condition or thing contributing to the danger of the accident complained of." (*Moore v. Bloomington, Decatur & Champaign R.R. Co.* (1920), 295

Ill. 63, 67, 128 N.E. 721, 722-723; see also *Amerco*, 87 Ill. App. 3d 827, 409 N.E.2d 299.) The admissibility of similar accidents is within the sound discretion of the trial judge (*Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 130, 253 N.E.2d 636, 645), and absent an abuse of discretion, the trial court's ruling will not be disturbed. *Amerco*, 87 Ill. App. 3d at 847, 409 N.E.2d at 316.

Plaintiffs have failed to convince this court that the crash of the subject aircraft and the crash of the Cessna 152 were caused by the same danger or defect. Indeed, as the preceding discussion indicates, the record reveals strong evidence to the contrary. This is unlike the situation in *Ballweg*, the case on which plaintiffs rely, where the instrumentality and cause of the subject accident were identical to the instrumentalities and causes involved in the prior occurrences which were admitted into evidence. Here, that is precisely the point of debate. We find, therefore, that the trial court's ruling was proper.

Plaintiffs also maintain that the trial court erred in allowing GAC to extensively cross-examine Canchola using portions of her deposition under the guise of impeachment when, in fact, GAC's real intention was to present Canchola's deposition testimony to the jury as substantive evidence.

On direct examination, Canchola testified that there was very little ice on the plane. Defendants were permitted to cross-examine her using portions of her deposition regarding when she first noticed ice during the flight and what the ice looked like. Plaintiffs acknowledge the propriety of impeaching Canchola's in-court testimony with prior inconsistent statements. However, plaintiffs maintain that defendants' real intention was to present Canchola's deposition testimony as substantive evidence. In support of this contention, plaintiffs point to defense counsel's closing argument in which he asked the jury to rely on Canchola's testimony about ice on the wing. In plaintiffs' view, the testimony to which defense counsel was referring was not Canchola's in-court testimony—which reflected adversely on defendants—but her deposition testimony, which supported their theory of the case.

A party may not, in the guise of impeachment, offer a prior statement of a witness as substantive evidence. (*People v. Collins* (1971), 49 Ill. 2d 179, 194, 274 N.E.2d 77, 85; *Parson v. City of Chicago* (1983), 117 Ill. App. 3d 383, 388, 453 N.E.2d 770, 774.) However, the use of a deposition during cross-examination is proper where the deposition testimony appears to be inconsistent with the direct testimony at trial (134 Ill. 2d R. 212(a)(1); *Chavez v. Watts*

(1987), 161 Ill. App. 3d 664, 670, 515 N.E.2d 146, 150), and Illinois courts have recognized instances where a claimed lack of memory at trial can be used as a denial of a prior account. (See *Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 222 N.E.2d 468 (deposition testimony describing slippery conditions, depth of water, and position of puddle admissible to impeach trial testimony where witness did not remember slippery conditions).) It is the jury's role to assess any conflicting evidence and to judge the witness' credibility (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969, 973-74), and an instruction to that effect was given. The trial court's decision to permit a prior statement to be used for impeachment will not be disturbed in the absence of a clear abuse of discretion. *Palumbo v. Kuiken* (1990), 201 Ill. App. 3d 785, 790, 559 N.E.2d 206, 209.

■ We note at the outset the significance of Canchola's testimony describing her observations of the icing conditions which existed at the time of the flight. Although other undisputed references to icing conditions on October 20 were made at trial, Canchola was the only eyewitness able to testify as to what she observed during the flight. Indeed, the trial judge recognized the need to explore the potential weaknesses in Canchola's testimony, and he in fact permitted impeachment of her trial testimony only where necessary. Furthermore, plaintiffs were free to clear up any inconsistencies on redirect examination.

After carefully reviewing the record, we do not find that the trial judge abused his discretion in permitting defendants to cross-examine Canchola using excerpts from her deposition. The trial judge was keenly aware of the distinction between substantive and impeachment use of prior inconsistent testimony, and he carefully considered the arguments of counsel from both sides before concluding that defendants' sole intention was to impeach Canchola's direct examination testimony. Furthermore, when plaintiffs' counsel requested that the jury be instructed that Canchola's deposition testimony was not admissible as substantive evidence but rather solely for the purpose of impeaching Canchola's credibility, the trial judge readily agreed to do so in the event such an instruction was tendered. However, we find no evidence in the record that plaintiffs ever tendered such an instruction to the court. A trial court is not required to issue an instruction *sua sponte*. On the contrary, failure of a party to make known to the court during an instructions conference the desire to include a specific instruction will bar that party from asserting omission of that instruction as an issue on ap-

peal. *McKinney v. Coca Cola Bottling Co.* (1988), 170 Ill. App. 3d 362, 524 N.E.2d 657.

Plaintiffs also assert that the trial court committed prejudicial error by admitting the hearsay statement of air traffic controller Terry Bolerjack, that at the time of the crash there was "heavy ice all over the area." Hearsay evidence is in-court testimony or written evidence of a statement made out of court which is offered as an assertion of the truth of the matters contained in the out-of-court statement. *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738; *Hengels v. Gilski* (1984), 127 Ill. App. 3d 894, 469 N.E.2d 708; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.1, at 562 (5th ed. 1990); Fed. R. Evid. 801.

Plaintiffs maintain that they were particularly prejudiced by the admission of Bolerjack's statement since his statement was one of only two pieces of substantive evidence defendants presented to support their theory that ice accumulation caused the crash, and they were unable to cross-examine Bolerjack regarding the basis of his statement.

In response, defendants first contend that the statement was deemed admitted pursuant to Illinois Supreme Court Rule 216(c) because plaintiffs neither objected to the admissibility of the air traffic control (ATC) transcripts containing the statement nor denied the foundation, admissibility, or authenticity of the transcripts. Defendants also contend that the written and tape-recorded statements made by Bolerjack to the decedent during the flight are admissible pursuant to Illinois Supreme Court Rule 236, which represents an exception to the hearsay rule for business records made in the regular course of business.

■ As to defendants' first contention, we note from the record that in response to defendants' requests to admit certain facts, plaintiff estate of Olk indeed filed a response admitting the accuracy of the prepared transcription of radio transmissions between the decedent and ATC. This transcription included the statement by Bolerjack to the decedent that there was "heavy ice all over the area." Similarly, plaintiff Van Steemburg stipulated to the foundation necessary for the admission of the transcripts of ATC conversations with the decedent. Consequently, we find persuasive defendants' assertion that under Illinois Supreme Court Rule 216(c), the statement at issue was deemed admitted.

We are similarly persuaded by defendants' second contention, that the statement is admissible under Illinois Supreme Court Rule 236(a), which states, in pertinent part:

"Any writing or record *** made as a memorandum or record of any act *** shall be admissible as evidence of the act *** if made in the regular course of any business, and if it was the regular course of the business to make such a *** record at the time of such an act ***. All other circumstances of the making of the writing or record, *including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility.*" (Emphasis added.) 134 Ill. 2d R. 236.

Rule 236(a), representing an exception to the rule against hearsay, is designed to permit the admission of business memoranda which impart a circumstantial guarantee of trustworthiness. The term "business" is defined in Rule 236(a) to include business, profession, occupation, and calling of every kind. The rule adopted what was formerly subsection 1732(a) of the Federal Business Records Act (28 U.S.C. §1732 (1988)), on which various Federal courts of appeal had relied in holding that transcripts of recorded radio communications between an aircraft pilot and ATC are admissible as business records. (See *Solomon v. Warren* (5th Cir. 1976), 540 F.2d 777, *cert. dismissed sub nom. Warren v. Serody* (1977), 434 U.S. 801, 54 L. Ed. 2d 59, 98 S. Ct. 28; *LeRoy v. Sabena Belgian World Airways* (2d Cir. 1965), 344 F.2d 266, *cert. denied* (1965), 382 U.S. 878, 15 L. Ed. 2d 119, 86 S. Ct. 161.) In *LeRoy*, the Second Circuit held that a recording of the kind at issue here is "part of a regular air control procedure *** [and is] at least the equivalent of a regular written journal kept by the [air traffic controller] and [as such is] a contemporaneous business record." (*LeRoy*, 344 F.2d at 273.) Plaintiffs do not contend otherwise.

Thus, unless plaintiffs can show that the source of information or the circumstances of preparation of the transcript indicate a lack of trustworthiness, Bolerjack's statement is admissible as a business record. (See *Eastman v. Department of Public Aid* (1989), 178 Ill. App. 3d 993, 534 N.E.2d 458.) In this regard, plaintiffs first assert that the statement was untrustworthy because Bolerjack used the term "heavy" in describing the ice, while under FAA rules, ice is classified only as "trace," "light," "moderate," or "severe." Although Bolerjack may not have used a designated term to describe the ice, that fact standing alone, however, does not make the statement untrustworthy.

Plaintiffs also argue that Bolerjack based his statement on information received from "unnamed pilots," which created an additional level of hearsay and added to the untrustworthiness of the

statement. We agree that Bolerjack's statement that there was "heavy ice all over the area" constitutes double hearsay. However, Rule 236(a) specifically states that the "circumstances of the making of the writing or record, *including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility.*" (Emphasis added.) (134 Ill. 2d R. 236(a).) Thus, under Rule 236(a), the statement is admissible. Additionally, the report of icing conditions was given to Bolerjack by a pilot in flight, and it is the regular practice of pilots to report to ATC specific weather conditions which they observe in the course of their flights. Both the pilot and Bolerjack acted in the normal course of business, and the transcript containing the statement at issue was merely a product therefrom. Neither the unnamed pilot nor Bolerjack was an interested or adverse party to this litigation, and thus had no motive to falsify the transcript. We conclude that admission of Bolerjack's statement was not error.

Plaintiffs also contend that the trial court erred in refusing plaintiffs' modified version of IPI Civil 2d No. 60.01 jury instruction, which relates to a party's duty to follow the applicable maintenance manual. Plaintiffs sought to have the jury instructed as to the required maintenance of the aircraft by incorporating a section of the Federal Aviation Act (49 U.S.C.A. §1301 *et seq.* (West 1980)) into IPI Civil 2d No. 60.01. The amended instruction would have read:

"There was in force at the time of the occurrence in question a certain federal regulation which provided that:

'each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller or appliance shall use the methods, techniques and practices prescribed in the current manufacturer's maintenance manual.'

If you decide that a party violated the regulation on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, a party was negligent before and at the time of the occurrence."

Plaintiffs contend that the trial court's refusal to give the tendered instruction was reversible error. In support, they point to the testimony of GAC's president, Richard Sullivan, who agreed that his mechanics were to follow the inspection procedure set out by manufacturers of component parts. Plaintiffs also maintain that GAC's expert agreed on cross-examination that if the GAC mechanic had followed the Champion maintenance manual and color

chart, he would have replaced the spark plugs at the annual inspection. Plaintiffs assert that the jury could have found that a violation of the regulation was the proximate cause of the accident. In support, plaintiffs cite *French v. City of Springfield* (1976), 65 Ill. 2d 74, 357 N.E.2d 438, in which the court held that the violation of a statute or ordinance designed for the protection of human life or property is *prima facie* evidence of negligence.

■■■ The trial judge, in rejecting this instruction, stated, "I think this could be very confusing, because there really isn't anything in evidence concerning the current manufacturer's maintenance manual, it's never been identified, and I think it would mislead the jury to have them wondering what may be contained in the manufacturer's manual." In fact, the jury heard no evidence regarding the current manufacturer's maintenance manual; what it heard was the testimony of Sullivan as to what GAC requires its mechanics to refer to when inspecting spark plugs. This is insufficient to bring this jury instruction into play.

The giving of a jury instruction is within the trial court's sound discretion, and reversal is only warranted where there was clear abuse of such discretion. (*Moore v. Bellamy* (1989), 183 Ill. App. 3d 110, 118, 538 N.E.2d 1214, 1219.) We find no clear abuse here.

■■■ Finally plaintiffs argue that GAC's counsel engaged in reversible misconduct during his opening statement when he stated that the wreckage had been stored for a period of time in a "junkyard." Any error, however, was cured by the trial court's sustaining of plaintiffs' objection. Moreover, the comment is unlikely to recur in the new trial.

For all the reasons stated, the directed verdicts in favor of T.K. and RTCI are affirmed. The judgment in favor of GAC is reversed and the cause is remanded for a new trial against GAC in accordance with these directions.

Affirmed in part; reversed and remanded in part with directions.

EGAN and GIANNIS,* JJ., concur.

---

*Justice Rosemary LaPorta participated in oral argument prior to her death. Justice Gus P. Giannis was substituted on the panel and has listened to the oral argument tape and has read the briefs.