NO. 4-96-0788

IN THE APPELLATE COURT 

OF ILLINOIS

FOURTH DISTRICT

FIRST MIDWEST TRUST COMPANY, as    )  Appeal from

Administrator of the Estate of Jerry    )  Circuit Court of

Mallady, Deceased, and GAYTHEL MALLADY,    )  Douglas County

Individually,    )  No. 93L17

Plaintiffs-Appellants and    )  

Cross-Appellees,    )

v.    )

PAUL TY ROGERS and THE TOWN OF ARCOLA,    )

Commonly known as ARCOLA TOWNSHIP,    )  Honor­able

Defendants-Appellees and    )  Stephen H. Peters,

Cross-Appellants.    )  Judge Presiding. 

______________________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In July 1993, plaintiffs Jerry Mallady and his wife Gaythel sued defen­dants, Paul Ty Rogers and the Town of Arcola (Arcola), for damages resulting from a collision between Jerry's automobile and a snow­plow driven by Rogers during the course of his employ­ment with Arcola.  In July 1996, the jury awarded damages based on Rogers' negli­gence and found Jerry 50% compara­tive­ly negli­gent.

Plaintiffs appeal, arguing that (1) an enforceable settlement agreement existed; (2) defendants' reconstruction expert should not have been allowed to testify; (3) the trial court erred by allowing defendants to present section 11-205 of the Illinois Vehicle Code (Code) (625 ILCS 5/11-205 (West 1992)) to the jury; (4) the court should have set aside the comparative negli­gence finding and entered a judgment notwithstanding the verdict (judgment 
n.o.v
.) on liability; and (5) the damages award is inadequate.  Defendants cross-appeal, arguing that the court erred by (1) denying defendants' motion to reduce the damages award by the amount of funeral expenses and medical expenses for which plaintiffs had no liability; and (2) failing to apply section 2-1115.1 of the Code of Civil Procedure, as amended (
735 ILCS 5/2-1115.1 (West Supp. 1995)), to limit the damages award for count III.  We affirm in part, vacate in part, reverse in part and remand with directions.

I.  BACKGROUND

A.  The Accident

On February 26, 1993, Rogers was working for Arcola plowing county roads in that township.  Rogers stopped at the inter­section of County Road 500N

and Route 45, looked in both directions, and began to drive across Route 45.  Jerry was driving north on Route 45 and collided with the snowplow.  Rogers testi­fied that he did not see Jerry's car.  He later pleaded guilty to the offense of failure to yield the right-of-way (625 ILCS 5/11-904 (West 1992)).

Jerry suffered severe injuries, including a closed head injury resulting in bleeding into the brain, facial lacera­tions, multiple rib frac­tures, a lacer­ated and ruptured lung, broken left leg and hip, dislocat­ed hip, and right ankle, spinal, skull, and jaw fractures for which he underwent several surgical procedures.  He remained hospital­ized for 3½ months during which he was given an artificial airway and feeding tube and placed on a respirator.  He remained in a coma for many months, gradu­al­ly regaining conscious­ness during the summer of 1993.  In June 1993, he was moved to a nursing home.  He had contin­uous diffi­cul­ty with infec­tions and was occasional­ly read­mitted to the hospital for treat­ment.  In September 1993, he returned to the hospital for reha­bilita­tion.  

In December 1993, he was discharged to the Oddfellows Nursing Home, where Dr. Mark Dettro took charge of his medical care.  Dr. Dettro testified that Jerry's head injury had caused a central nervous system dysfunc­tion, leaving him unable to walk, speak, swallow, feed himself, or reposition himself in bed.  He never regained those functions, receiving all food, liquid, and medication through a feeding tube and spending 95% of his time in bed.  On October 14, 1995, Jerry died of pneumo­nia.  Jerry's medical treatment and nursing home care costs  totaled $761,531.70.

B.  
Procedural History

In July 1993, Jerry and Gaythel sued defendants for negligence and loss of consortium.  In April 1995, the circuit court ap­point­ed (1) First Midwest Trust Company (First Midwest) as guardian of Jerry's estate and (2) Gaythel as guard­ian of Jerry's person.  In June 1995, they were substi­tuted as party plain­tiffs for Jerry.  

Jerry died at 4:45 p.m. on October 14, 1995, and on October 16, 1995, the circuit court appointed Gaythel as special administra­tor for Jerry's estate.  The parties had negotiated throughout the pretrial period and plaintiffs claim that they had agreed to settle on October 14, 1995, two days prior to trial.  On October 19, 1995, plaintiffs filed a motion to compel settlement.  The trial court denied the motion in February 1996.  

In March 1996, Gaythel, individually and as administra­tor for Jerry's estate, filed an amended com­plaint adding a cause of action for wrongful death.  In April 1996, the trial court granted Gaythel's motion to substitute First Midwest as adminis­trator for Jerry's estate.  The final complaint alleged 16 counts, including causes of action based on negli­gence against both Rogers and Arcola for (1) surviv­al, (2) family expenses, (3) loss of consor­tium, and (4) wrongful death.

Following a trial in July 1996, the jury returned a verdict finding defendants negligent and awarding damages for each of three counts, as follows:

count I, survival action: verdict--$1,504,708.50; count II, loss of consor­tium: verdict--$755,000; and count III, wrongful death: verdict--$1 million.  The jury also found Jerry 50% comparatively negligent and reduced his damages awards to $774,354.25, $377,500, and $500,000, re­spectively, for a total of $1,651,854.25.

II.  THE PURPORTED SETTLEMENT AGREEMENT

Plaintiffs first argue that a valid settlement agree­ment existed for the trial court to enforce and the court erred by denying their motion to compel settlement.  We disagree.

The parties began negotiat­ing prior to tri­al and continued to do so before the trial was scheduled to begin on October 16, 1995.  On October 14, 1995, the parties' attor­neys talked again and discussed a settle­ment figure of $4.5 mil­lion.  Plaintiffs claim that the parties had agreed to settle at this amount, based on a 2:30 p.m. record­ed telephone message between the parties' attorneys.  

On October 13, 1995, Jerry went to the hospital to have his feeding tube replaced.  He returned to the nursing home after the proce­dure, but his condi­tion worsened and he was readmitted to the hospital at about 2:30 a.m. on October 14, 1995.  Gaythel arrived at the hospital at about 3 a.m.  She tele­phoned her son Shawn at about 6 a.m. and told him that Jerry was in serious condi­tion.  

Around 8 a.m., Shawn tele­phoned Carroll Dukes (the attorney representing Gaythel and the guard­ians of Jerry's person and estate).  Shawn told Dukes that Jerry was hospi­talized and asked him what effect this would have on the trial that was set to begin two days later.  Dukes informed him that this was another reason why settlement should be pur­sued.  Dukes told Shawn that he would recommend settlement if defendants would "come up with [about] $4,500,000."  Shawn agreed with the sugges­tion.  Later that day, Gaythel agreed with Shawn, but she did not speak to Dukes about it.

After talking with Shawn, Dukes telephoned Jim Kearns, an attorney for defendants, around 9 a.m. on October 14, 1995, concern­ing the settlement negotiations.  Dukes indicated that he was prepar­ing for trial, but that defendants' October 12, 1995, settlement letter suggested that there might be a chance for settlement.  Kearns indicated that defendants would probably settle for $4.5 million and that he would recommend that amount.  Dukes stated that he wanted to settle the matter that day.  Dukes did not tell Kearns that Jerry had been hospitalized that morn­ing.  At the end of the telephone conversation, Dukes informed Kearns that he would be unavailable during the day and that Kearns could leave his response on Dukes' telephone answering ma­chine.    

Around 3 p.m. on October 14, 1995, Kearns called Dukes and left the following message on his answering machine:

"Carroll, this is Jim Kearns.  I'm call­ing.  I think we got a deal.  A cou­ple of loose ends to be tied up, but I don't think it's any­thing critical.  The money number is the County's or the Township's willing to accept that number so long as you understand we don't have the money until we get a bond issue floated and we'll do that as fast as we can, but we don't really have a feel for how long that takes.  Also, we have to have a release from the children of any potential wrongful death claim, but I don't see any one of those as a problem.  I'm sure you under­stood both of those to be the case, but I was supposed to specifically mention those things.  So, I'll be here this evening if you want to talk about it or we can just talk sometime before Monday ***."

Before Dukes called Kearns back, Dukes received a message from Shawn informing him that Jerry had died around 4:45 p.m. that after­noon (October 14, 1995).  At 6:43 p.m. that same day, Dukes left a message on Kearns' answering machine, indicat­ing that the $4.5 million and the two conditions were acceptable.  

At some point after Dukes left the 6:43 p.m. message on Kearns' machine, Kearns learned from a third party that Jerry had died earlier in the day.  Kearns telephoned Dukes and they discussed Jerry's death and the effect it might have on the settlement discussions.  Kearns indicated to Dukes that they may have a valid settlement, but that he wished to research the matter further before arriving at a final decision.

The trial court provided a detailed and cogent analy­sis in its nine-page memorandum of decision denying plaintiffs' motion to compel settlement.  The court found that (1) Dukes' 9 a.m. phone conversation constituted continu­ing negotiations, not an offer; (2) even if Dukes' statements during that call consti­tuted a
 valid offer, Kearns' 3 p.m. telephone message was a counteroffer, not a valid acceptance; (3) Kearns' 3 p.m. message can best be characterized as an offer; and (4) Dukes' telephone call to Kearns at 6:43 p.m. was a valid accep­tance of Kearns' 3 p.m. offer.  Nevertheless, the trial court concluded that the purported settlement agreement was not en­forceable because Jerry died at 4:36 p.m., raising doubt about Dukes' authority to settle.  We agree with the court's conclu­sion; more particularly, for the reasons discussed below, we con­clude that the matter is re­solved by the limits placed on Dukes' authority by sections 24-19(a) and 10-4 of the Probate Act of 1975 (Act) (755 ILCS 5/24-19(a), 10-4 (West 1994)).

The trial court questioned Dukes' authority to settle by considering whom he represented at the time he accepted Kearns' offer.  Before Jerry died, Dukes represent­ed First Midwest, as guardian of Jerry's estate, and Gaythel, both indi­vidu­ally and as guardian of Jerry's person.  A guardian's status is governed by section 24-12 of the Act, which provides that "[t]he office of a representa­tive of a ward 
termi­nates
[,] *** subject to [s]ection 24-19, when the ward dies."  (Emphasis added.)  755 ILCS 5/24-12 (West 1994).  (Section 1-2.15 of the Act includes guardian in its defini­tion of "repre­senta­tive."  755 ILCS 5/1-2.15 (West 1994).)  Thus, once Jerry died, the offices of guard­ianship held by First Midwest and Gaythel termi­nat­ed, except as out­lined in section 24-19 of the Act.

Section 24-19(a) of the Act provides, in pertinent part, that "[w]ithout order of appointment and until the issuance of letters testamentary or of admin­istration or until sooner discharged by the court, a representative of the estate of a deceased ward has the powers and duties of an administrator to collect."  755 ILCS 5/24-19(a) (West 1994).  After Jerry died, First Midwest could only represent Jerry's estate as an "adminis­trator to collect."  Section 10-4 of the Act defines the duties and powers of an administrator to collect, in pertinent part, as follows:  "An admin­istra­tor to col­lect has power to sue for and col­lect the per­sonal estate and debts due the decedent *** and by leave of court to exercise the powers vested by law in an ad­minis­trator."  755 ILCS 5/10-4 (West 1994).  Thus, the authority of an administrator to collect is limited to 
pre­serv­ing
 an estate.  
In re Estate of Breault
, 29 Ill. 2d 165, 179, 193 N.E.2d 824, 832 (1963).  

After Jerry died, Dukes still represented First Mid­west, as guardian of Jerry's estate, and Gaythel, as guardian of Jerry's person, but section 10-4 of the Act limited First Midwest's author­ity as guardian to preserving Jerry's estate.  As an adminis­trator to col­lect, it had no authority to accept a settlement offer.  Moreover, because section 24-19(a) of the Act does not address a representative of the person, Gaythel's office of guardianship terminated upon Jerry's death.  In fact, it appears that, during the interim between Jerry's death and the appoint­ment (on October 16, 1995) of Gaythel as adminis­trator for Jerry's estate, 
no
 
one
 had the authority to agree to a settle­ment.  Because Dukes' authority as agent for the guardians could not exceed his principals' authori­ty, Dukes exceeded his author­ity when he accepted the settle­ment offer.  According­ly, no valid settlement agreement existed for the trial court to enforce, and the trial court correctly denied plaintiffs' motion to compel settlement.

III.  ACCI­DENT RECONSTRUCTION TESTIMONY

Plaintiffs next argue that the trial court erred by allow­ing defendants' accident reconstruction expert, Professor Louis Metz, to testify.  Specifically, they contend that Metz's experi­ment and the opinions based thereon fail to meet admissi­bility stan­dards.  We agree.  

Prior to trial, plaintiffs filed motions 
in
 
limine
 object­ing to Metz's testimony on several grounds, including the following: (1) acci­dent recon­struc­tion testimony should not be ad­mitted when eyewitness testi­mony is avail­able; (2) Metz's proposed testimony did not meet the stan­dards for admis­sibili­ty of expert reconstruction testimony because it lies within the ken of the average juror; (3) Metz's testimony was based on unreli­able data because experimental condi­tions did not substan­tially replicate the conditions at the time of the acci­dent; and (4) Metz's testimony was highly specula­tive.  In ruling upon plain­tiffs' motions, the trial court considered Metz's deposi­tion testi­mony, which showed that (1) weather and road condi­tions during the experi­men­t differed substantially from condi­tions at the time of the acci­dent; (2) Metz's method­ology was subjective; (3) he made several assump­tions regarding the conduct of Rogers and Jerry; and (4) he was unable to use his usual formu­la for calcu­lating experimental values.  Despite these deficiencies in Metz's proposed testimony, the court denied all of plaintiffs' motions to bar it, and Metz testified at trial sub­stan­tial­ly the same as his deposi­tion testimo­ny.

Metz's testimony showed that he is a recognized expert in the field of acci­dent recon­struc­tion.  He conducted an experi­ment in May 1995 in which he sought to have Rogers reenact his driving on the day of the colli­sion to determine whether Jerry contrib­uted to the accident.  At his deposition, Metz stated:

"What I tried to do was estimate the speeds of the two vehicles at impact.  I calculated their relative speeds with a momentum analy­sis.  I estimated the absolute speed of [Rog­ers' snowplow] from experimental data which I took on 9 May [1995], and then I did some cal­cu­la­tions *** to show where [Jerry] would have been at the moment that [Rog­ers] began to move [for­ward from the stop sign]."

One of the values Metz needed to complete his calcula­tions is the common veloci­ty of the vehi­cles after colli­sion, which is normal­ly calcu­lated using a formula based on the fric­tion charac­teris­tics of the road (friction coefficient) and how far the two vehi­cles slid.  However, Metz was unable to use the normal formula because (1) the vehi­cles rolled over rather than slid; and (2) he was unable to determine the fric­tion coeffi­cient for Route 45.  Instead, Metz designed an experi­ment to provide him with the necessary information.  

Metz de­scribed his experiment as fol­lows:

"I had Mr. Rogers stop at the stop sign as he testified he did on the day of the accident.  I instructed him to drive the vehicle straight across the road as closely as he could remem­ber to the way he drove it when the accident occurred and I had him repeat it two or three times to get the feel of it and we took five successive runs' worth of data."

In his deposition, Metz acknowledged that he did not know of any authority in the literature for utilizing this type of experiment for reconstruction, but stated, "I've done it many other times, both experi­mentally and theoretically."

As a result of this experiment, Metz determined that Rogers' vehicle was moving at "a little over seven miles per hour" at the time of the collision.  He based all other calcu­la­tions and his opinions on this experimental data.  

Metz calculated Jerry's speed at impact (37 to 38 miles per hour).  He then calculated the distance it would take Jerry to stop his vehicle, based on (1) a normal perception reaction time (the interval between first perceiving danger and then reacting to it) beginning when Rogers first pulled away from the stop sign; (2) an assumed friction coefficient for Route 45 of 0.7; and (3) two different assumptions for the speed of Jerry's vehicle, 55 miles per hour and 40 miles per hour.  Based on either speed assumption, he con­cluded that Jerry could have avoided the acci­dent by "simply lifting his foot off of the throttle when Mr. Rogers first began to move from the stop sign."

On cross-examination, Metz testified that the stop sign was located about 30 feet back from the edge of Route 45, and Jerry was traveling north in the lane farthest away from Rogers' vehicle.  When Jerry first saw the snowplow move, it would have been moving slowly, having 30 feet within which to come to a stop before it even reached the west side of Route 45 (at the south­bound lane).  According to Metz, Jerry could reason­ably have assumed that (1) the snowplow was going to (a) stop again at the highway's edge, or (b) turn south on Route 45 (rather than cross it); and, (2) if he could see the snowplow, its driver could see him.

A.  Metz's Experimental Evidence

Generally, the admissibili­ty of experi­mental evi­dence depends upon the proponent's ability to show that the essential conditions of the experiment were the same as those at the time of the acci­dent.  
Van Steemburg v. General Aviation, Inc.
, 243 Ill. App. 3d 299, 323, 611 N.E.2d 1144, 1161 (1993).  In 
Ford v. City of Chicago
, 132 Ill. App. 3d 408, 416, 476 N.E.2d 1232, 1239 (1985), the court stated:

"The admissibility of an experiment depends upon whether the conditions of the experiment are substan­tially similar to the actual cir­cumstances of the particular case, although the conditions need not be identical.  [Cita­tion.]  
Ex­per­i­ments
 
are
 
incompetent
 as evi­dence where they do not duplicate the essen­tial condi­tions existing at the time of the acci­dent which gave rise to the litigation."  (Empha­sis added.)

The trial court's determination of admissibility of experimental evidence lies within its sound discretion, and a reviewing court will not re­verse absent an abuse of such discretion.  
Van Steemburg
, 243 Ill. App. 3d at 323, 611 N.E.2d at 1161.  

In this case, the essential conditions include (1) the road configuration, (2) road condi­tions, (3) weather conditions, (4) the snowplow vehicle, and (5) Rogers' driv­ing.  Two condi­tions were similar; the road configu­ration had not changed and the snowplow used was the same one Rogers had driven the day of the colli­sion.  (The snowplow supposedly contained an amount of rocks to replicate the amount of snow it con­tained on the day of the collision, but Metz admitted it was impossible to know whether it was loaded identically.)  However, other essen­tial condi­tions of the experi­ment differed substan­tially from condi­tions on the day of the collision--namely, the road and weather conditions and Rogers' driving.  Rogers testi­fied that on the day of the acci­dent, it had been snowing, the sky was gray and overcast, and snow was on the roads.  In con­trast, on the day of the reen­act­ment, the roads were clear and dry and it was not snow­ing.

Metz conceded that he was unable to completely recon­struct this accident because the weather was very different on the morning of the collision.  He also had essentially no infor­mation regarding the road surface conditions on Route 45 and County Road 500N or their friction coefficients. 

More important, Metz admitted that his methodol­o­gy was subjec­tive.  He asked Rogers to drive the snowplow in a manner similar to the way he drove on the day of the colli­sion.  Regard­ing the effect of Rogers' driving on the experiment re­sults, Metz testified:  "If Mr. Rogers had accelerated on the day of the accident fast enough to spin his wheels, let's say, then the ultimate traction between tire and snow would make a difference, but he accelerated[,] in fact, very gently [during the experiment] and anyone can do that."  Putting aside Rogers' self-interest in driving particularly carefully during the experiment, we note that Metz recorded five trials with times varying from 7 to 10 seconds, a difference of 30%, according to Metz.  Metz then used the mean derived from these five trials to perform his calculations.

In the present case, the road and weather conditions--two essen­tial conditions--during the experiment varied signif­icant­ly from those at the time of the collision.  Addition­ally, the trial court had no way of knowing whether Rogers' driving duplicated his driving at the time of the colli­sion.  Because the essen­tial condi­tions of the experiment varied significantly from those exist­ing at the time of the collision giving rise to litiga­tion, the court here should have excluded the evidence derived from the experi­ment.  Thus, we hold that the court's failure to do so constituted an abuse of discre­tion.  
Ford
, 132 Ill. App. 3d at 416, 476 N.E.2d at 1239.

B.  The 
Frye
 Standard

Even if Metz had been able to duplicate the essential condi­tions of the collision other than Rogers' driving, and even if Rogers had made his best good-faith effort to duplicate his driving at the time of the collision, it is likely that such an experi­ment could never be suffi­ciently reliable to be admissible as a matter of law.  This is so because the experiment fails to meet the stan­dards for admissi­bility of novel scien­tific evidence enunci­at­ed in 
Frye v. United States
, 293 F. 1013, 1014 (D.C. Cir. 1923), which Illinois follows.  
People v. Miller
, 173 Ill. 2d 167, 187, 670 N.E.2d 721, 731 (1996).  

In 
Frye
, the court wrote that "while courts will go a long way in admit­ting expert testimony deduced from a well-recog­nized scien­tific principle or discov­ery, the thing from which the deduc­tion is made must be suffi­ciently established to have gained general accep­tance in the particu­lar field in which it belongs."  
Frye
, 293 F. at 1014.  The determination of whether a party has met the 
Frye
 stan­dard lies within the trial court's discretion, and a reviewing court will not reverse absent an abuse of that discretion.  
Miller
, 173 Ill. 2d at 187, 670 N.E.2d at 731.  

In applying the 
Frye
 standard, the trial court must determine that (1) the scientif­ic test is reli­able; and (2) the test's reliability is generally accepted in the particular scientific field to which the test belongs.  M. Graham, Cleary & Graham's Handbook of Illinois Evidence §702.4, at 562-63 (6th ed. 1994) (hereafter Handbook of Evidence).  If the basis of an expert's opinion in­cludes so many varying or uncer­tain factors that he is required to guess or surmise to reach an opin­ion, the expert's opinion is too specula­tive to be reli­able.  
Dyback v. Weber
, 114 Ill. 2d 232, 244, 500 N.E.2d 8, 13-14 (1986); 
Baird v. Adeli
, 214 Ill. App. 3d 47, 65, 573 N.E.2d 279, 290 (1991).

Adopting the 
Frye
 standard requires courts to rely somewhat on the "community" of experts to help the courts decide admis­si­bility.  
Mercado v. Ahmed
, 756 F. Supp. 1097 (N.D. Ill. 1991).  However, even when proponents can make a color­able claim that a particular experi­ment has been accepted by the appro­priate scien­tific community, the courts still may not dele­gate their author­i­ty to the scientific community.  Indeed, had the trial court here admit­ted Metz's experimental evi­dence on the basis that the scientific community had somehow accepted Metz's method­ol­o­gy, this court would still hold that such a deter­mi­nation consti­tuted an abuse of discretion because the experi­mental data is inherent­ly unreli­able.  

In the present case, Metz assumed that (1) Jerry could see the snowplow even though Rogers testified that he did not see Jerry's vehi­cle; and (2) a reason­ably prudent person would per­ceive immi­nent danger and begin to take evasive action as soon as Rogers pulled out from the stop sign--which was located 30 feet west of Route 45.  (These assump­tions are question­able, as Metz admit­ted in his deposi­tion.)  He then calculated Jerry's percep­tion reac­tion time begin­ning when Rogers initially pulled away from the stop sign and con­clud­ed that, if Jerry had taken his foot off the accelera­tor at that point, the collision would not have occurred.  Further, as plaintiffs pointed out, 
Metz was unable to use the usual scien­tif­ic formula for deriving the common speed of the two vehi­cles after impact because several factors were unknown (in­cluding the friction coeffi­cients of the road surface and the speeds of the vehi­cles prior to impact).  Thus, Metz's testimony was based on highly speculative data and dubious assumptions.

In addition, Metz's pur­port­ed scien­tif­ic testi­mo­ny was based on a formula and methodol­ogy he creat­ed.  Defen­dants point to no scientific literature ad­dressing or testing this method, nor to any scien­tist or expert (other than Metz himself) using such an experiment in acci­dent recon­struction.  In fact, Metz admit­ted that, al­though he had used this type of experiment many times, he knew of no author­i­ty in the scien­tific litera­ture that supported it.  

In this case, the experiment results provided the founda­tion for all of Metz's calculations, conclu­sions, and opin­ions.  Yet the experiment's reliability and validity are highly question­able because of the differing conditions, subjec­tive method­ology, and assumptions on which it was based.  In our judgment, these factors should have led the trial court to reject the experiment's reli­abil­i­ty under the 
Frye
 standard.  

Moreover, we note that, even under the more liberal 
Daubert
 stan­dard for the admissibility of novel scientific evi­dence (
Daubert v. Merrell Dow Pharmaceuticals, Inc.
, 509 U.S. 579, 594-95, 125 L. Ed. 2d 469, 483-84, 113 S. Ct. 2786, 2797-98 (1993)), the party pre­senting the expert must still show that the expert's findings are based on sound science, as opposed to unscientific speculation--as in the present case.  
Daubert v. Merrell Dow Pharmaceuticals, Inc.
, 43 F.3d 1311, 1316 (9th Cir. 1995)
; see 
Wil­son v. City of Chica­go
, 6 F.3d 1233, 1238 (7th Cir. 1993) ("The elimination of for­mal barriers to ex­pert testi­mony has merely shifted to the trial judge the responsibili­ty for keeping 'junk science' out of the court­room");
 
Rosen v. Ciba-Geigy Corp
., 78 F.3d 316, 318 (7th Cir. 1996) (the trial court must determine whether scientif­ic evidence is genu­inely scientif­ic, as distinct from being unscien­tific specu­lation offered by a genuine scien­tist); 
Joiner v. General Elec­tric Co.
, 78 F.3d 524, 530 (11th Cir. 1996) (the trial court must find that scientif­ic evidence is "indeed scientifi­cal­ly legiti­mate, and not 'junk science' or mere specu­lation").  
  

IV.  ADMISSIBILITY OF SECTION 11-205 OF THE CODE

Plaintiffs next argue that the trial court erred by allowing defendants to present section 11-205 of the Code (625 ILCS 5/11-205 (West 1994)) to the jury.  We agree.

Section 11-205 of the Code provides, in perti­nent part, as follows:

"(a) The provisions of [the Vehicle Code] applica­ble to the drivers of vehicles upon the highways shall apply to the drivers of all vehicles owned or operated by *** any *** town, district[,] or any other political subdivision of the State, except as provided in this Section ***.

* * *

(f) Unless specifically made applicable, the provisions of this Chapter *** 
shall
 
not
 
apply
 to persons, motor vehicles[,] and equip­ment 
while
 
actually
 
engaged
 
in
 
work
 
upon
 
a
 
high­way
 but shall apply to such persons and vehi­cles when traveling to or from such work."  (Emphasis added.)  625 ILCS 5/11-205 (West 1994).

Several courts have addressed the construction of section 11-205(f) of the Code.  In 
Creamer v. Rude
, 37 Ill. App. 2d 148, 185 N.E.2d 345 (1962), the court applied the statute to the driver of a snow­plow who had stopped to spread cinders to assist a stalled truck.  In so doing, the court concluded that the driver was "actu­al­ly engaged in work upon the surface of the high­way," pursuant to the stat­ute.  
Cream­er
, 37 Ill. App. 2d at 157, 185 N.E.2d at 348.    

In the more recent case of 
Townsend v. Gaydosh
, 197 Ill. App. 3d 339, 343-44, 554 N.E.2d 648, 651 (1990), this court stated that section 11-205(f) of the Code was "designed to protect State workers from traf­fic viola­tion liability while performing road work construction, 
i.e.
, enabling the driver to drive the grader the wrong way on the wrong side of the road in order to repair and smooth over a bump on the pavement."  

At trial, defendants did not claim that the statute applied to Rogers; instead, they sought to present the statute as evidence sup­port­ing their claim that Jerry was con­tributorily negligent.  However, if the statute does not apply to Rogers, then its presentation to the jury involved a ques­tion of rele­vance.  Irrelevant evidence is not admissible.  
Clemons v. Mechanical Devices Co.
, 292 Ill. App. 3d 242, 247-51, 684 N.E.2d 1344, 1347-50 (1997); Handbook of Evidence §402.1, at 178.  Even relevant evidence may contain drawbacks of sufficient importance to call for its exclusion, including unfair prejudice, confusion of the issues, and misleading the jury.  Handbook of Evidence §403.1, at 178.  See 
Gill v. Foster
, 157 Ill. 2d 304, 313, 626 N.E.2d 190, 194 (1993) ("Even relevant evidence may be excluded if its probative value is substantially out­weighed by such factors as prejudice, confusion, or potential to mislead the jury").  Thus, if a piece of evi­dence has slight proba­tive value, 
any
 prejudi­cial effect on the jury may require exclu­sion.  Moreover, if the evi­dence is merely confus­ing and creates uncertainty, that alone may suffic­e to tip the balance in favor of exclusion when the informa­tion sought to be presented contains negligible probative value.  

One of the tests that a trial court may use when evaluating relevance is to ask how it would view this evi­dence if it were the trier of fact.  Would the proposed evidence assist the trial court in resolv­ing questions of fact?  See 
Yamnitz v. William J. Diestelhorst Co.
, 251 Ill. App. 3d 244, 250, 621 N.E.2d 1046, 1050 (1993) (offered evidence is relevant if it renders a matter in issue more or less probable in light of logic and experience).  If not, then the evi­dence should be exclud­ed.  The court may also use the follow­ing indica­tor:  if the propo­nent of the evi­dence has difficulty even articulat­ing the basis for admis­si­bility at trial--as in this case--that consti­tutes the judicial equiva­lent of a cau­tion­ary yellow stop­light.  

On appeal, defendants have aban­doned the basis for admis­sion they asserted at trial.  Instead, they now claim that the statute does indeed apply to Rogers; thus, he was not obli­gated to yield the right-of-way to Jerry.  Defendants reason that, as a li­censed driver, Jerry was charged with knowl­edge of the rules of the road, including section 11-205(f) of the Code.  There­fore, he should have (1) known that Rogers had no duty to stop before crossing Route 45, and (2) immedi­ate­ly acted to prevent a colli­sion.  Based on this assump­tion and Metz's testi­mo­ny that Jerry could have avoided the colli­sion, defendants contend that the statute pro­vides evi­dence that Jerry was negli­gent.  We are not persuaded.

In this case, Rogers was simply driving the snowplow across the highway at the time of the collision, which in­volved no use of the truck that re­quired Rogers to drive in a manner that violated the Code.  The legis­la­ture could not have intended that a snowplow driver may blithely and routinely ignore traffic regulations, espe­cially when--as here--he has his plow lifted and is merely driving across a preferential high­way.   

Moreover, Rogers testi­fied that he was trained to stop for stop signs and yield to cross traffic, and his supervi­sor con­firmed that testimony.  Rogers pleaded guilty to the offense of failing to yield the right-of-way, and plain­tiffs introduced that guilty plea into evi­dence.  

Under the circumstances of this case, we con­clude that section 11-205(f) of the Code does not apply to Rogers and it was thus wholly irrele­vant to the issues in this case.  Accord­ingly, we hold that the trial court erred by admit­ting evi­dence per­tain­ing to the statute.

The material in section V is not to be published pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

Nonpublishable material under Supreme Court Rule 23 omitted.

VI.  DAMAGES

Defendants cross-appeal, arguing that the trial court erred in awarding damages.  Specifically, defendants contend that the damages award for count I, the survival action, should be reduced by amounts for (1) funer­al and memorial ex­penses; (2) medical expens­es that were subject to being written off by medicare and public aid; and (3) medical expenses for which Jerry and his family bear no liabil­i­ty--namely, those benefits covered by Jerry's health maintenance organiza­tion (HMO), PersonalCare.

The material in sections A and B is not to be published pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

Nonpublishable material under Supreme Court Rule 23 omitted.

C.  Medical Expenses Covered by Jerry's HMO

1.  
The Collateral Source Rule

Defendants next argue that the damages award for count I should be reduced by the amount of medical expens­es for which Jerry and his family bear no liabil­i­ty--namely, those expens­es covered by Jerry's HMO.  Specifically, defendants contend that the collat­er­al source rule does not apply to services provided by Jerry's HMO because Jerry was never liable for $377,582.92 worth of medical services provided by Covenant Medical Center (Cove­nant) and Christie Clinic Association (Chris­tie) hospi­tals.  In contrast, an insurance policyhold­er who re­ceives medical services is liable to the medical care provider and, in turn, the insur­ance company is obligated to reim­burse the policy­holder for covered expenses.  In response, plaintiffs argue that the collat­eral source rule ap­plies here.  We agree with plain­tiffs.

PersonalCare, Jerry's HMO, sup­plies managed care servic­es.  It is owned by a company that is affiliated with Chris­tie and a company that is part of the hospital system that owns Covenant.

Jerry was a member of PersonalCare by virtue of an agreement that provided that Jerry would receive certain health care benefits in return for paying PersonalCare a monthly premium of about $400.  The agree­ment was in effect on the date Jerry was injured and contin­ued in effect until August 31, 1994. 

Lisa Pellum, business services manager for Christie, testified that Jerry received servic­es for which the usual and customary charges were $28,008.95.  Because he was a member of PersonalCare, Jerry was respon­si­ble for only $6,080.70 of that amount.  

Simi­larly, Nancy Pecora, patient financial counselor at Covenant, testified that Jerry was only respon­sible for $14,745.54 of $410,107.10 for Covenant's services.  (The public aid and medi­care write-offs, discussed above, were deduct­ed from Covenant's total.)  In offers of proof outside the jury's pres­ence, Pecora testified that PersonalCare would have paid Cove­nant a certain amount, called a capitation payment, regard­less of whether the hospital treated Jerry.  When Jerry was treated, that capita­tion payment was allocated to his treatment.  Defendants contend that PersonalCare does not pay Covenant the money "by virtue of [Jerry's] treatment"; instead, the allocation is simply an ac­count­ing proce­dure.  

Whether the collateral source rule applies to HMO benefits is an important policy question that has arisen as a result of funda­mental changes in the health care system.  Al­though the legislature has not addressed this issue, our review of the philosophical underpinnings of the rule leads us to conclude that the rule applies in this case.  

The collateral source rule states that benefits re­ceived by an injured party from a source wholly independent of, and collateral to, a tortfeasor will not diminish damages other­wise recoverable from the tortfeasor.  
Wilson v. Hoffman Group, Inc.
, 131 Ill. 2d 308, 320-21, 546 N.E.2d 524, 530 (1989).  The ratio­nale for the collat­er­al source rule is that a wrongdoer should not benefit from expendi­tures made by the injured party, or take advantage of contracts or other relations which exist between the injured party and third persons.  
Wilson
, 131 Ill. 2d at 320, 546 N.E.2d at 530.  Al­though injured parties may receive a windfall from the collat­eral source rule, it is usually considered more just for an injured party to receive the windfall than for a wrongdo­er to be relieved of full responsibili­ty for his wrongdoing.  
Wilson
, 131 Ill. 2d at 321-22, 546 N.E.2d at 530-31.

This rationale applies equally to an injured party who con­tracts with an HMO for medical bene­fits.  From Jerry's point of view, the con­tract he entered into with PersonalCare was equiva­lent to an insurance policy.  He did not care what sort of accounting methods his HMO used or whether the providers of his medical care were business partners or owners of the HMO.  To reduce the damages award in this case would allow defendants to benefit from Jerry's decision to purchase health coverage from an HMO rather than from a conventional insurance compa­ny.  Although HMOs differ from insurance compa­nies in significant ways, those differ­enc­es do not subvert the philo­sophical founda­tion of the collater­al source rule.  We reject defendants' attempt to distin­guish HMO benefits from insurance benefits.  The fact remains that the benefits Jerry received as a result of his PersonalCare member­ship are collater­al to defen­dants.  Accord­ingly, we con­clude that the collateral source rule applies to the medical expens­es covered by Jerry's HMO. 

2.  
Section 2-1205.1 of the Code of Civil Procedure

Alternatively, defen­dants seek to apply section 2-1205.1 of the Code of Civil Procedure (Procedural Code)(735 ILCS 5/2-1205.1 (West 1992)) to the damages award, which would reduce it by $342,982.92 ($377,582.92 less $25,000, less $9,600 for two years' premi­ums).  (Section 2-1205.1 provides that a judgment will be reduced by any amount in excess of $25,000 of the bene­fits provided for medical or hospi­tal charges, but such reduction does not apply to the extent that there is a right of recoup­ment through subroga­tion, lien, or otherwise.  735 ILCS 5/2-1205.1 (West 1992).) 

In response, plain­tiffs contend that the costs for the medical servic­es Jerry re­ceived were subject to recoup­ment; therefore, the section 2-1205.1 reduction does not apply.  They claim that the agreement between PersonalCare and Jerry specif­ically pro­vides for such recoupment.  We agree with plain­tiffs.  

Regarding Jerry's repay­ment obliga­tion, that agreement provides as fol­lows:

"IX.  RIGHT OF REIMBURSEMENT.  For benefits provided by PersonalCare under this certifi­cate, PersonalCare shall be entitled to reim­bursement and shall succeed to any right of recovery *** against a third party respon­si­ble for the member incurring benefits.

***

The member, or anyone acting on his behalf, agrees:

***

D.  That PersonalCare:

1.  Shall have a lien on all funds recovered in connection to the loss 
to
 
the
 
extent
 
of
 
its
 
pay­ment
 ***."  (Empha­sis added.)

The conflict arises as a result of the parties' differ­ing views on whether the capita­tion pay­ments PersonalCare made to Cove­nant and Christie consti­tute "pay­ments" in the context of the agreement.

    Defendants admit that PersonalCare pays Covenant a monthly capitation payment of $347,237.61 in return for medical services for PersonalCare members.  They contend that because PersonalCare would have made this payment even if Jerry had not received any treatment, it did not constitute a "payment" for Jerry's medical services.  

The hospitals clearly provided medical services to Jerry; it is equally obvious that those services were not cost-free.  The hospi­tals collec­tive­ly allo­cat­ed $377,582.92 of the capita­tion amounts they received from PersonalCare toward Jerry's treat­ment by making an account­ing entry.  Only an ac­count­ing entry was required because of the con­trac­tual relationship between PersonalCare and the hospi­tals through which the hospi­tals provided medical treat­ment to PersonalCare members in return for unallocated pay­ments made by PersonalCare to the hospitals.  The capita­tion payments obviously cannot be allocated until the hospi­tal actual­ly pro­vides medical services to PersonalCare members.  Accordingly, the ac­count­ing transfer is a valid reflec­tion of the amount of reason­able and customary medical expenses "paid" by PersonalCare to the hospi­tals for Jerry's treatment. 
 

Moreover, defen­dants admit that PersonalCare has a right to claim reim­bursement for expenses Jerry incurred from medical provid­ers with whom PersonalCare has no contractual relationship.  (PersonalCare made pay­ments of $173,160.62 to healthcare provid­ers other than Christie and Covenant with whom it did not have con­tracts.)  In that case, the alloca­tion to the member preced­ed the payment.  We see no significant difference between these two methods of paying for health care.  Thus, we con­clude that PersonalCare's pay­ments to Covenant and Christie constitute "payments" subject to recoup­ment.  Accordingly, we hold that the trial court did not err by failing to reduce the damage award, pursuant to section 2-1205.1 of the Procedural Code.   

The material in section VII is not to be published pursuant to Rule 23 (166 Ill. 2d R. 23).

Nonpublishable material under Suprme Court Rule 23 omitted.

VIII. CONCLUSION

For the reasons stated, we affirm in part and reverse in part, as follows:  (1) we affirm the judgments in favor of plaintiffs and against defendants; (2) we reverse the trial court's denial of plaintiffs' motion for judgment 
n.o.v
. regard­ing Jerry's alleged comparative negli­gence, and accord­ingly, we vacate the reduction of the damages based on compar­a­tive negli­gence.  With regard to defendants' cross-appeal, we (1) reverse the trial court's ruling denying the reduction of count III's damages for funeral and memori­al expenses that were includ­ed in count I; and (2) grant defendants' request to correct the damages award to conform to the trial court's previ­ous ruling reducing the damages award for count I by the medicare and public aid payments.  

Affirmed in part, vacated in part, reversed in part, and remanded with directions.

KNECHT and GREEN, JJ., concur.